## THE STATE OF IOWA;

DES MOINES, DECEMBER TERM, A. D. 1859.

In the fourteenth year of the State.

---

PRESENT:

HON. GEORGE G. WRIGHT, CHIEF JUSTICE.
 " WM. G. WOODWARD, } JUSTICES.
 " L. D. STOCKTON, }

---

### DES MOINES NAVIGATION AND RAILROAD · COMPANY
### v. THE COUNTY OF POLK.

1. REVENUE. The lands granted by the United States to the State of Iowa, for the improvement of the navigation of the Des Moines River, by the Act of Congress, approved August 8th, 1846, and certified by the Register of the Des Moines River Improvement to the Des Moines Navigation and Railroad Company, were not subject to taxation as· the property of said company, before the title was conveyed by patent, as prescribed by law.

2. STATUTES CONSTRUED. Sections 455 and 456, Code of 1851, and chapter 152, laws of 1858, considered and construed.

3. TITLE TO DES MOINES RIVER LANDS. The title of the Des Moines River Lands was not passed to the Des Moines Navigation and Railroad Company, by the certificate of the Register of the Des Moines River Improvement. The title remained in the State until conveyed by patent.

VOL. X.          1

2        SUPREME COURT CASES.—1859.

Des Moines Navigation and Railroad Co. v. The County of Polk.

4. WHEN PROPERTY MAY BE ASSESSED. Property acquired from the government, after the time fixed by law for the completion of the assessment for the current year, is exempt from taxation until the following assessment.

*Appeal from Polk District Court.*

FRIDAY, NOVEMBER 4.

THIS is an agreed case submitted for the determination of the question, whether certain lands were taxable for the years 1857 and 1858, as the property of the Des Moines Navigation and Rail Road Company.

By an act of Congress of the 8th August, 1846, certain lands were granted by the United States to the State of Iowa, for the improvement of the navigation of the Des Moines river. This act contained provisions limiting and directing the times and proportions of the conveyance of the lands to the company, making this dependant upon the previous outlay of money, upon the works of improvement. On the 9th January, 1847, the General Assembly of Iowa accepted the grant. The contract between the State and the company was entered into on the 7th June, 1854, and is found in the appendix to the House Journal of the session of 1854–5. The Register of the Des Moines River Improvement, by his certificate of the 14th May, 1855, and the 6th May, 1856, certified certain amounts of land to the company, which contain the lands in question, situate in Polk county.

The agreed case states that the Governor refused to execute a patent for these, when first requested, and that one was finally executed the 3d May, 1858, which was received by the Register on the 10th June, and recorded 16th June, 1858, and then delivered to the company under a resolution of the General Assembly, of the 22d March preceding. Prior to the taxation in question, these lands had not been reported by the Register to the Auditor, as sold; nor by the Auditor to the county as for taxation.

It is agreed that, if the court is of opinion that the lands were subject to the tax, judgment should be rendered for the

Des Moines Navigation and Railroad Co. v. The County of Polk.

defendants, but if not, then for the plaintiffs, and the defendants should be enjoined from proceeding to collect the same.   The District Court rendered judgment for the defendant and the plaintiffs appeal.

*John A. Kasson*, for the complainant, and appellant, submitted both oral and written arguments in which the following synopsis of legislation relating to this subject, and legal propositions based thereon, were presented:

SYNOPSIS.—The question presented for the decision of the court is this: Were the lands described taxable for state and county purposes prior to the assessment for 1859 ?   In the solution of this question the attention of the court is directed to the course of legislation respecting these lands, and the powers of the state officers in respect thereto.

[1847.]   The Board of Public Works first had the power of sale of lands, and the Treasurer thereof acted in the capacity of receiver, and the Secretary thereof as register, and sales were to be made from time to time as contemplated by the terms of the congressional grant.   (Acts of 1847, chapter 113, section 26.)   Upon their certificates, patents were to issue to the purchasers, executed by the Governor.   (Ib. section 30.)

[1848.]   The Auditor of State was required at the following session to procure abstracts of all land entries at the different land offices, and furnish the same to the several county clerks for assessment.   (Acts of 1848, chapter 63, sections 3, 4.)

[1849.]   This year the Board was reorganized, but the mode of sale was the same; and the Secretary of the Board was required to make out the deeds for lands sold, in fee simple, and forward the same to the Governor for execution.   It was the duty of the latter to sign the same and cause the seal of the State to be affixed ; after which they were to be returned to the Secretary, recorded, and then delivered to the purchaser.   (Acts of 1849, chapter 85, sections 4, 5.)   The

4        SUPREME COURT CASES.—1859.

Des Moines Navigation and Railroad Co, v. The County of Polk.

lands were to be sold, on entry in usual manner, or at pub-
lic sale, the board having the power to regulate the sale.

[1851.] At this session the Assembly abolished the
Board of Public Works, and provided for the appointment of
a commissioner of the river improvement, and the register
of the same. (Chapter 58, sections 7, 8.)

The Register was to perform all acts connected with the
sale of said lands which formerly devolved on the Secretary
and Treasurer of Board of Public Works.

The Commissioner and Register were authorized to allow,
by contract, in payment for the improvement at and below
Keosauqua to completion, as the work progresses, any por-
tion of the lands below the Raccoon Forks, at $1.25 per
acre.

Also, had power to dispose of any other lands belonging
to the improvement, in like manner, that is, by contract, and
allowing them at a rate of not less than $1.25 per acre in
payment to the contractor, as the work progressed; all such
contracts being subject to the approval of the Governor.
Or, they could order them sold at not less than $1.25 per
acre. (Ib., section 15.)

Deeds in fee simple were to be made by the Register and
Governor, as before by the Secretary and Governor; that is,
filled up by the Register, when sold, and executed by the
Governor with the seal of State, and returned to the Regis-
ter, and recorded, and then delivered. (Ib., section 23.)

[1853.] By the 32d chapter of the Acts of this year, the
Commissioner and Register were empowered to sell and dis-
pose of all or any of the lands belonging to the improvement
for no less than $1.25 per acre, or $1,300,000 in the aggre-
gate. (Section 1.)

These two officers, jointly, were empowered to convey in
fee simple, or otherwise, any or all said lands. (Section 2.)

Any contracts for the purpose of selling said lands, &c.,
were only valid when *signed by the Commissioner, countersign-
ed by the Register, and approved by the Governor,* (section 4;)
and by chapter 103 of the same year, two assistants were

SUPREME COURT CASES.—1859.                5

Des Moines Navigation and Railroad Co. v. The County of Polk.

named, who, with said Commissioner, together could make' such contracts, the Register being excluded, (section 4,) and they were to make no contract which did not stipulate for at least $1,300,000 to be expended. (Section 6.)

The Governor's approval still remained necessary to the validity of the contract.

All prior legislation was so modified, as to transfer the contracting power from the Commissioner and Register, to the Commissioner and assistants. (Section 4.)

[1855.] At the session of this year, the State Land Office was established; and *all patents for state lands* were thereafter to issue from this office only, and to be signed by the Governor, and recorded, and signed by the Register, (section 6,) and no patent for river lands could issue except *on the written requisition of the Commissioner*, and with a certain clause provided for, (section 8.) The State thus retaining title until passed *sub regula*.

[1857.] At this session of the General Assembly the State repudiated and ignored all the claims of this company; resumed the power to sell, pledge, or dispose of all said lands; organized a new selling and contracting board, and authorized them to proceed to make a new contract, and settle up all old indebtedness, (chapter 222, sections 1, 3.) It also provided for a sale of all the unsold lands, subject to the provisions and restrictions of the Act of Congress donating the same. (Section 4.)

The offices of Register and Assistant Commissioner were abolished. (Section 7.)

[1858.] By chapter 99, of this session, all the lands of said grant, except those " heretofore sold by the State of Iowa, or *which may hereafter be conveyed* to the D. N. & R. R. Co., by virtue of a settlement now pending between the State and said Company," were disposed of and granted to the K. Ft. D. M. & M. R. R. Co.

By way of further assertion of her right, the State by joint resolution No. 7, ordered proceedings for an injunction

against the company, to prevent further proceedings under said contract.

And by joint resolution No. 4, fixed the conditions upon which the company should take title to the lands now in suit, embracing new considerations for this conveyance, both in money, materials, and choses in action. " The State of Iowa *shall* by its proper officer *certify and convey* to the said company, all lands, &c.," ignoring the past, providing for the future.

I also refer to *Journal of the Senate*, 1857, report of Committee on " River Improvement," page 539, *et seq.*

Message of Governor, same session, on the subject of Des Moines River Improvement.

Both, as well as the law passed at the same session, repudiate the contract, as well as the so called certificates of title. To the fullest extent the executive and legislative department of the state government, at the session of 1856–7, declared that the company had no title to any particular or describable lands belonging to that grant; nothing that amounted to a conveyance, and assumed the absolute control of this title.

PROPOSITIONS. I. By the Code (section 455,) unchanged by subsequent enactment, " the property of the United States, and that of this State," is not subject to assessment for taxes.

The complainant (appellant) contends that at the time of assessment of these lands in 1857 and in 1858, they fell within that description of exempted lands. That is our position.

The counter proposition, on the part of defendants, is duplex, namely :

*First.*—That the Register's certificates of 1855, operated as a conveyance to the company.

*Second.*—That the contract between the State of Iowa and the company, made in 1854, was a sale on credit, under the 466th section of the Code, which subjects to taxation " lands, lots in towns, including lands *bought* from the United

States and from this State, and whether bought on a credit or otherwise."

It is conceded that these lands were, on the 8th day of August, 1846, the property of the United States. At this date they were granted in fee to the State of Iowa, for a given object. This object, however, did not run with the land as a condition appurtenant to the fee. It belonged, rather, to the disposition of the proceeds of sale of the lands. The mode of sale by the State was, nevertheless, regulated by the donating act—the terms of the grant. The State could not lawfully dispose of the lands, "except as said improvement shall progress," that is, sufficient to produce $30,000 by the first sales; and after the Governor shall certify to the President that $15,000 have been actually expended upon the improvement, the State may sell to the amount of $15,000 more, or sufficient to replace the amount expended; and so on from time to time as expenditures are made, and certificates reported. This was the perpetual regulation of the sales by the State. Act of Congress, of 1846, August 8th.

This was accepted by the State, January 9, 1847, and the whole provisions of the act, thus had, and have, the force of a compact between the United States and the State of Iowa.

The mode of sale was part and essence of the contract, and, until repealed, must regulate the sales by the State.

But, upon this point, it is answered that the Act of Congress, approved August 3d, 1854, (chapter 201,) operated to release this regulation of the sales of lands granted. This we deny.

Because 1, the act of 1854 is in no sense a repealing statute; and 2, because a fee simple within the meaning of this act, did pass in 1846; and 3, because the regulation of sales was matter of compact between this State and the United States. I hold the Act of Congress of 1854, to be inapplicable to the question under discussion, and to the whole case at bar.

It is, for the purposes of this discussion, immaterial whether

the title was vested in the United States, or in the State of Iowa, in 1854, when the contract with the River Company was made. In either case the lands were exempt from taxation. But we assume the title to have been in the State of Iowa on the 9th day of June, 1854, the date of the contract between the State and this company, the complainant. The lands in question having been certified by the Commissioner of the General Land Office, prior to the year 1852, thus rendering the grant certain, by description of land, the title was perfected in the State.

The next question is, did the State sell said lands to the company, "upon credit or otherwise," and if so, when and how? Were they "bought" by the company, either on a credit, or for full payment down, within the statutory meaning?

The Code (section 456,) containing this provision came into force in 1851, long prior to this contract. It is evident, therefore, that it could not have been expressly contemplated by this provision. The sales intended to be provided for by this section, as subjecting these lands to taxation, were the egular sales by the United States, and the sales of school lands, &c., by the states, for which provision was made by law. These sales embraced these four elements: 1, a fixed price; 2, certain described land; 3, a certain payment in cash; 4, a written contract showing a sale *in presenti*, and the deferred payments in money, as regulated by law, with interest. These were the sales on a credit referred to. See the 11th and 12th clauses of the contract.

By all the provisions of pre-existing laws, the Governor's signature was requisite to conveyances of state lands. His signature was not affixed to the contract, nor to the Register's certificates in question; nor did he even recognize the validity of these certificates in any way.

But the contract provided, that upon the expenditure of $30,000, the State of Iowa, "or the then proper agent or officer, or officers of the State, shall transfer to and convey to the said [company,] or to the then Register of said Im-

SUPREME COURT CASES.—1859. 9

Des Moines Navigation and Railroad Co. v. The County of Polk.

provement, or such other person as the party of the first part [company] may direct" an equal amount of lands, at $1.25 per acre, deducting 15 per cent.

Here the future conveyance was expressly stipulated, and the mode and time by which and when property was to pass. So far from the Register being the party grantor, he was recognized as a probable party grantee. The property was to be conveyed by the State, or her then proper officers, to the Register, or other party to be designated.

Now, who were these "proper officers?" The Act of January 25th, 1855, (chapter 153, section 8 and section 6,) which came into force on the 9th February, 1855, supplies the answer to this question, in the most precise and explicit language. Thus " *  * no patents or conveyances of Des Moines Improvement lands shall issue, except on the written requisitions of the Commissioner thereof," and with a specified clause to be inserted in the patent, (section 8,) and all patents were to issue from the State Land Office, "and shall be signed by the Governor, and recorded by the Register." (Section 6.)

Now the first of these certificates was not issued until May 1855, three months after this law came into force, and the other more than a year later. How, then, can it be maintained that it was a " conveyance " of the river lands, when it was issued *without the Commissioner's requisition, without the signature of the Governor, not out of the State Land Office, and by· an officer destitute of any existing authority·by law to make a conveyance.*

To support this position I refer to the case and opinions in this court, June term 1857, Mss. of State of Iowa *on relation of W. C. Johnson* v. *Commissioner of Des Moines River Improvement.*

From these premises it is reasonably concluded, perhaps demonstrated, that these lands remained " the property of the State of Iowa " on and after the dates of the said certificates, as fully as they did on and after the execution of said contract. No other act of conveyance is asserted, un-

til the admitted conveyance by the State, regularly made in June 1858, in accordance with the resolution of the General Assembly passed in March, 1858.

II.   The whole course of legislation of the State supports these views, as do also its executive and judicial action :

1. The Governor failed to sign the contract.

2. He refused to issue any patents to the company.

3. A large committee of the General Assembly at the session of 1856–7 (see Senate Journal, p. 540) reported that no legal contract existed between the State and the company.   (See index to same, "Bills" No. 220.)

4. The General Assembly at that session, acting upon this report, passed a law (chapter 222) repudiating the contract, and providing for another, and recognizing the necessity, in sales, of proceeding according to the terms of the original congressional grant.   (Section 4. Ib. chap.)

5. The records of this court (June term 1857) show the State resisting the company's claim against the State for a conveyance of these lands, and successfully resisting it.

6. The General Assembly (chapter 99) in 1858, divert the lands to another purpose.

7. The State at the same session, (joint resolution No. 4,) for new considerations, orders a conveyance to be made of these very lands, in this language :   "   *   and the State of Iowa shall by its proper officer *certify and convey* to the said company all lands granted," &c., &c.   Beyond this no language could go further to assert her continuing, and then existing right of property, and right of control, in and over these very lands.

8. The State makes a deed, as proprietor of these lands, in June 1858, and records it and delivers it to this complainant.

Upon these facts we present the question, whether the State is not *estopped*, by matter of record and *in pais*, from affirming that the lands were not her property, but were the property of this company in 1855 and 1856 and 1857.

Take the rule as laid down in New York, (8 Wendell 482) and adopted by this court (*Lucas* v. *Hart*, 5 Iowa, 415) that "the acts and admissions of a party, operate against him in the nature of an estoppel, where, in good conscience and honest dealing, he ought not to be permitted to gainsay them." Under this rule the State should be estopped. She has by her perpetual assertion of title, and hostile appropriation of these lands, prevented this company from making sales, or other beneficial disposition of these lands, and refused a conveyance until June 1858, and then for new considerations, and now asserts the right to recover money by taxes thereon, as the former property of the company and not her own.

The three requisites of estoppel suggested in the same case, (5 Iowa) are also found here :

1. Her acts, and her deed, asserting her continued ownership, are inconsistent with her assertion of former title in this complainant, and her right to tax.

2. This complainant has acted upon the claim of the State to ownership, by buying and receiving a new title, and by refusing to pay these taxes.

3. It is plain they will be injured in thousands of dollars by the taxation.

III. One point more will dispose of this whole branch of the argument.

I offer this proposition : That the deed from the State to the company, operates as an entire release for the lands from all title, whether by tax lien or otherwise, whether in fee or by incumbrance, or in any other mode existing, or asserted at the time of the execution of the deeds Every conveyance " passes *all* the interest of the grantor therein," unless a contrary intent appears from the deed itself. (Code, section 1201.)

Nor can the county, acting under and by virtue of authority from the State, stand in any better position. If the lien for State taxes falls, that for the county taxes must fall also,

as imposed by the same authority. The principal includes the subordinate.

IV. It remains to inquire if there is any distinction to be taken in principal or effect between the assessments for the years 1857 and 1858.

By the Code (section 470,) the assessment commenced with the 1st March, each year.

In 1857, (chapter 146, section 21) this was repealed, and the regulation was changed to the 1st February of each year, (section 10,) except in 1857, when the 1st May was named for that year only. (Section 19.) The assessment was to be made in 1857, and biennially thereafter.

In 1858 (chapter 111, section 1) the county boards of equalization were authorized to raise or diminish the assessment for 1857, at a meeting to be held 2d Monday of May, 1858, and their doings were to be immediately certified to the state board.

At the same session (chapter 152) the assessor must commence his assessment (section 25) within six days after the 2d Monday of January of each year, and conclude it (section 28,) on or before 2d Monday of April in each year, when the county board of equalization is required to meet. (Section 31.)

It thus appears that the assessment was made for the year commencing February 1; or else it is made for the calendar year 1858.

No rule for the assessment of lands strikes my mind as more just or more in harmony with statutes, than this:

That lands, not taxable at the time fixed for the commencement of the assessor's duties, do not become taxable until the next following assessment.

This rule is supported by a statute of 1848, (chapter 63, sections 3, 4, page 63) which is still in force, and shows the intent of the Legislature on this subject so clearly as, perhaps, to remove all doubt. (See, also, section 113 of Code.)

This exempts these lands from liability to taxation for 1858. They became taxable for the first time in 1859.

Des Moines Navigation and Railroad Co. v. The County of Polk.

*Casady & Crocker*, for the appellee.    No brief on file.

WOODWARD, J.—The question presented is, whether the lands in question, conveyed to the complainants by the State, in June 1858, were taxable for the usual state and county purposes, prior to the date of the conveyance.

The provision of the Code (section 455) exempts from taxation, "the property of the United States and that of this State." It then becomes a question whether the lands were the property of the State, or of the petitioners. The complainant contends that these lands so appropriated and commonly called "the River Lands" were the property of the United States or of the State, until the delivery of the patent from the State to the company, in June 1858, and therefore were exempt. On the other hand the respondents urge the second clause of section 456, which declares that lands and town lots, including lands bought from the United States and from this State, and whether bought on a credit or otherwise, are subject to taxation. And they argue that the contract between the State and the company, of June, 1854, was a sale on a credit within the above section; and second, that the certificates of the Register above referred to, of May 1855, and May 1856, operated as a conveyance. As emphasis is undoubtedly laid upon the language of these papers, it is given in substance. That of the first date runs thus:    "I certify that the following lands were sold by me on this 14th May, 1855, to the Des Moines Navigation and Rail Road Company, in pursuance of the contracts and agreements with said company, for the construction of the Des Moines River Improvement;" which is signed by the State Register of that work. The second is as follows: "This certifies that the following lands, being a part of the land appropriated" &c., "have this day been transferred, and are hereby conveyed to" the said company in consideration of $144,657.71 expended in pursuance of the contracts, &c., between the State and the said company.

Des Moines Navigation and Railroad Co. v. The County of Polk.

We are well satisfied that the lands were not the property of the company, so as to render them subject to taxation at the times in question. This was not a purchase on credit, in the sense of section 456, above cited. This provision was enacted some time before this contract was made, and therefore could have no intended reference to it, Its material allusion is to those cases which may properly be termed purchases—lands bought on time, from either the State or the general Government. Purchases under the pre-emption laws, giving time for payment, and those of the school lands of this State, are plain subjects of this provision. In these cases the party enters into possession and has the use and enjoyment of the land prior to the payment, and this it is which constitutes the justice of the enactment. But we will take another view of this hereafter.

Neither can the other view prevail, which would regard the certificates as conveyances. The words implying a sale or conveyance in these papers, can have no such force. The Register had no authority for this; it was not within his power. By the terms of the act of Congress granting the lands for the express purpose, the company was first to expend money upon the work, and these lands to a certain relative amount were to be conveyed to them, and so, from time to time, in moderate quantities, as the work progressed. And in no case was the Register empowered to convey. He only certified to the amount expended by the company, and the quantity of land to which this entitled them, and the deed or patent was, by the law of the State, to be signed by the Governor. These papers, therefore, are entitled to no other force than as certifying the sums expended and the quantity of land to be conveyed.

But it is contended that the restrictive and directory provisions of the granting act were in effect released by an act of Congress of 3d August, 1854, which enacts that "where lands have been, or shall be granted to a state by law of Congress, and such law does not convey the fee simple, or require the patents to be issued therefor, the lists thereof,

SUPREME COURT CASES.—1859.    15

Des Moines Navigation and Railroad Co. v. The County of Polk.

certified by the commissioner of the General Land Office, under his seal of office, shall be regarded as conveying the fee simple of the lands properly included in such lists."

We are unable to perceive how this act should affect the terms, conditions, or objects upon and for which the grant might have been made. It goes no farther than to affect the mode by which the title may pass, dispensing in some instances, with the patent, but in no sense releasing from conditions or trusts annexed to the grant. These terms would not be contained in a patent from the United States, but stand in the act making the grant. Therefore, though the State might acquire her mere title by such a list, still the object of the gift, and the mode of dispensing it in detail, as the work progressed, would remain.

Did the company buy these lands of the State upon a credit? In view of the position of both parties, let us look at the entire transaction. Here is a great public improvement to be made, and here are supposed to be something like a million of acres of land appropriated for that purpose. The State makes a contract with a company to carry on the improvement and take the lands as a remuneration. But the act of Congress has anticipated the contingency of the whole passing into their hands and the work being then neglected, and has provided that it shall be meted out only in proportion to the progress of the improvement. This intention, this policy, would be entirely defeated, and the specific direction disobeyed, if the lands could be held to pass to the company by either of the modes above contended for. The idea that the lands pass by virtue of the contract above, is met in the outset by the difficulty that they are not yet ascertained either in quantity or in specific discription.

The contract is not, properly, one of sale. To the State the main object was to obtain a certain large internal improvement. The other party is to perform this work and take his compensation in lands, receiving them in proportion as it progresses. This contract is so similar to the prior one with another company, (Bangs, Bros. & Co.,) that if this can be

construed as conveying the title, so must that, and the result would be that they belong to that former contractor, unless the State has taken some measure to divest them.

In the act of 25th January 1855, chapter 153, sections 6, 8, we find a distinct provision by what means the title shall be conveyed. "No patents or conveyances of Des Moines Improvement lands shall issue, except on the written requisitions of the Commissioner thereof," and all patents were to issue from the State land office, and were to be signed by the Governor, and recorded by the Register. This provision indicates the object of the certificates in question, and limits their expression and intent, although the officer may have thought he was passing the very title. Their legal effect is only to certify that the company was entitled to so much land. The questions involved in this proceeding were determined in a former case before this court, June term, A. D. 1857; *The State ex rel., Johnson* v. *The Commissioners of the Des Moines River Improvement,* in which the company sought by means of a writ of *mandamus,* to compel the issuance of a certificate that they were entitled to a certain amount of lands. In that case both the State and the company stood upon the assumed ground that the title was still in the State. It is true that the certificates were not issued then, but the object in requiring that they be issued, was not by them directly to obtain the title, but to show that the company was entitled to the lands, and then obtain the title through another, and the proper source. Finally the legislation of the State has uniformly recognized as the fact, that the lands remained in it until a regular conveyance of them, and that no right in them save an *inchoate* one was transferred by the contract. See the former acts referred to. Senate Journal of 1857, page 542. Resolution of March 1858. Acts 1858, chapter 99, &c.

We conclude that the State had no right to tax these lands as property of the company, until she had conveyed them. This sufficiently disposes the case without determin-

ing whether the deed of June, 1858, constituted a release of such a right or such a lien.

One question, however, remains. It is whether the lands whose title was acquired in June, 1858, should be placed in the assessment of that year. The time when the assessment should commence has been changed, until, by the statute of 1858, chapter 152, it is fixed at the second Monday of January, or within six days thereafter, and it is to be concluded by the second Monday of April. The case does not require us to decide whether a party must hold his title at the beginning of the assessment, or whether it is sufficient if he acquire it during the period of taking it; but we are of the opinion that the true sense of the law is, that if one acquires his title from the government after the close of the assessment, the land is passed for that year. It can not be brought up as omitted property, and if it can be held subject for any reason, it may be brought into the list, though obtained however short a time before the next list is begun. Such a course would involve an inequality and injustice. This land not having been obtained from the State until June, in 1858, was not subject to taxation for that year.

The judgment of the District Court is reversed.