THE IOWA HOMESTEAD COMPANY v. WEBSTER COUNTY.

1. **Revenue:** RAILROAD COMPANIES. Under section 462, Code of 1851, and section 7, chapter 152, Laws of 1852, the tax on the property of railroad companies was only taxable for State and county purposes through the shares of the stockholders.

2. —— REPEAL. Chapter 152, Laws of 1858, except for the assessments, equalization and levy of the taxes for the year 1860, was repealed by article 1, chapter. 45, Revision of 1860, being chapter 162, Laws of 1862.

3. —— CHAPTER 45, REVISION OF 1860: RAILROADS. Chapter 45, Revision of 1860, was general, treating all property of all persons alike, whether belonging to railway companies or private persons, and whether lands, moneys or goods; and this act governed the levy of taxes for the year 1861.

4. —— CONSTITUTIONAL LAW. A revenue law which exempted the property of railroad and like corporations from taxation would be invalid under section 2, article 8 of the Constitution of 1857.

5. **Statute:** CONSTRUCTION. When an act of the General Assembly may receive a construction which makes it consistent with the Constitution, it is the duty of the courts to adopt it in preference to one which involves its invalidity upon that ground.

6. **Railroads:** CONSTRUCTION OF LAND GRANT ACTS: TWENTY MILES FROM COMPLETED LINE. It being conceded by both plaintiffs and defendants that a railroad company receiving a grant of lands under the act of Congress of May 15th, 1856, and the act of the General Assembly of the State of Iowa, of July 14th, 1856, has the right to select the lands and obtain certificates for lands situated more than twenty miles west of the completed line of their road, the question is not passed upon by this court in this case.

7. —— WHEN THE RIGHT OF THE COMPANY ATTACHES: TAXATION. Under said acts the railroad company becomes legally and absolutely entitled to one hundred and twenty sections of the land granted from the completion of twenty miles in the manner in said acts contemplated, the certificates of the Governor of the State and from the land department

of the general government being necessary only as evidence of a title already existing; and from the completion of such twenty miles the lands to which the company thus becomes entitled are subject to taxation.

*Appeal from Webster District Court.*

THURSDAY, OCTOBER 4.

THE petition makes the following case:

By an act of Congress approved May 15, 1856, certain lands were granted to the State to aid in the construction of four several lines of railway. July 16, 1856, these grants were accepted, and so much of the lands, interest, &c., as were granted to aid in the construction of a railroad from Dubuque to the Missouri river, were disposed of and conferred upon the Dubuque and Pacific Railroad Company, subject to the restrictions and conditions, &c. January 1, 1861, the fifth twenty consecutive miles of said road were completed, and the Governor so certified to the secretary of the interior on the 25th of April of that year. April 11, 1863, certain lands were certified to the company by the commissioner of the general land-office, and approved by the secretary of the interior. In this method, as is alleged, the company acquired full title and right to the lands, and sold a portion of the same to plaintiff on the 12th of November, 1863. A part of the lands thus sold were assessed for taxes for the years 1857, 1858, 1859, 1860, and all of them for 1861. A portion of them were sold for taxes for the years prior to 1861. The treasurer was proposing to sell for the year 1861, and to make deeds in accordance with the sales. The claim is, that said lands were not subject to said assessments, levies and sales; and the prayer is, that the treasurer be restrained from selling said lands, from making deeds, or in any way collecting the said taxes, and for general relief, &c.

Defendants demurred for the following causes:

*First.* No allegation that the title to said lands was in the United States or the State at the time of the several levies.

*Second.* The grant by the government was equivalent to a conveyance upon the performance of the conditions named, and under the allegations of the petition these conditions were performed prior to the levy of 1861, and said lands were therefore subject to taxation at least for that year.

*Third.* Plaintiff had a taxable interest in the lands for all the years, and they were subject to taxation for those years.

.Demurrer sustained. Plaintiff excepted and appeals.

*Jno. F. Duncombe* for the appellant.

*Theo. Hawley* for the appellee.

WRIGHT, J.—Appellant's counsel, in his printed brief, states that this action is brought to remove a cloud upon certain lands, caused by the taxes of 1859, 1860 and 1861, amounting in the aggregate to some $20,000, including penalty, interest and costs. And it is conceded that if the lands were taxable for these years, the judgment below should be affirmed. From this statement, therefore, it will be seen that we have nothing to do with the taxes for the years 1857 and 1858.

To determine the questions made, we are asked to respond to three inquiries:

1. How were lands belonging to the railroad companies to be taxed for the years 1859, 1860 and 1861?

2. Prior to the act of 1862 (ch. 173), were the lands taxable against the railroad company otherwise ·than through the shares of the company?

3. Were they taxable for the year 1861, and not for prior years?

It was determined in *Tallman* v. *Treasurer of Butler County* (12 Iowa, 531), that these lands were not taxable as lands for the year 1858. This decision was based upon section 462 of the Code of 1851, which provided that the property of corporations engaged in the constructions of railways, &c., should be taxed through the *shares of the stockholders.* This section was, almost in words, re-enacted by the act of 1858 (§ 7, ch. 152), the succeeding section (8) providing for a distribution of the tax, when collected, to the several counties in which the improvement may be situated; and, by the cases of *Faxton* v. *McCosh* (12 Iowa, 527), and *The City of Davenport* v. *The Mississippi and Missouri Railroad Company* (Id., 539 decided on the same day), it · was held, that the same rules extended to the taxes of 1859 and 1860. And while these cases, upon the point now under consideration, are not expressly affirmed in *The City of Davenport* v. *The Mississippi and Missouri Railroad Company* (16 Iowa, 348), there is nothing said in any of the three opinions in conflict therewith, but much of the reasoning of the several judges recognizes the correctness of the prior rulings. And, therefore, we may regard it as settled, that for the years 1858, 1859 and 1860, the property of such companies was only taxable for State and county purposes through the shares of the stockholders. And this conclusion disposes of all inquiries in this case, relating to the taxes of 1859 and 1860; and the ruling of the court below, holding the lands taxable as such, was erroneous, and must be reversed. So holding, it of course becomes unnecessary to ascertain whether the company for those years had or had not a taxable interest in such lands.

Were they taxable, then, for the year 1861? And here

1. REVENUE: railroad companies.

The Iowa Homestead Company v. Webster County

appellant claims that the same rule of taxation applies; and this claim involves the necessity of examining the revenue act of 1860. Rev., ch. 45. It is insisted that the act of 1858, on this subject, remained unchanged until 1862. Ch. 173. And to sustain this view we are referred to certain language of two of the judges in the case above referred to. 16 Iowa, 348 (pp. 355, 361). If what is there said is correct, and applicable to the extent claimed, then appellant is undoubtedly right, and these taxes were improperly levied for 1861, as well as for the prior years. For, says Lowe, J. (p. 355), "the act of 1851" (Code, § 462, which, as we have seen, taxed the property through the shares of the stockholders) "continued to be the only method of taxation (with a slight modification made in 1858), down to April, 1862." And says Cole, J. (p. 361), "The only laws of this State authorizing the taxation of railroad property at any time, may be found in the Code of 1851, section 462, Laws of 1858, ch. 152, and Laws of 1862, ch. 173."

*2 — repeal.*

The two former provide that property of corporations constructing railways, &c., shall be taxed through the shares of the stockholders, while the latter provides that it shall be taxed one per cent on the gross receipts of said corporation." Both of these propositions, substantially the same, are correct when properly understood, and especially when we consider the context. That each judge had in his mind the legislation of the State which provided by name and particular designation for the taxation of the property of these corporations, we think is quite clear. What effect or construction should be given to the act of 1860 (ch. 45) was not before us. And as this chapter does not provide a method for taxing such property different from that belonging to individuals, there was no great inaccuracy, when referring to the statutes which provided in terms

*3. — chapter 45, Revision of 1860: railroads.*

for a distinct method of levying and collecting such tax, to treat those named as the only ones authorizing the taxation, for this is strictly and substantially true. And yet it is not true that there was no law after 1858, and prior to 1862, authorizing the levy of 'taxes upon the property of all persons, corporate as well as natural. This law was general, however, treating the property of all persons alike, whether belonging to railway companies or private persons, and whether lands, money or goods. For it is declared that "the supervisors shall levy taxes upon the assessed value of the taxable property in the county" (§ 710); "that (after providing for certain exemptions) all other property, real and personal, within the State, is subject to taxation in the manner directed" (712). "All taxable property shall be taxed each year" (720). "The assessors shall assess all the property, personal and real," in his township (734). If the owner of real estate is unknown, it is to be assessed without connecting therewith any name (737). And then, by section 808, it is provided, that except for the assessment, equalization and levy of the taxes for the year 1860, ch. 152 (Laws of 1858) is repealed. And all other acts conflicting with this act (ch. 45) are also repealed so far as they are in conflict. It therefore seems to us beyond controversy, 'that the act of 1858 was not in force, except for the purposes stated, after the taking effect of the act of 1860; and that if the property of railway companies was not subject to taxation under the last law, it was not under any. In the absence of a statute conferring the power to tax, of course the right could not be claimed. And as the act of 1860 repealed that of 1858, and was the only law in force conferring the power, until 1862, it

4. —— con- follows that we must look to it to determine the
stitutional
law. method of levying taxes for 1861. For if this is not done, then there is no law authorizing the taxation

of railroad property, and the property of these and like corporations would be exempt, while that of all other persons would be liable. To hold this would involve the necessity of declaring the law obnoxious to a constitutional objection. For it is expressly declared that the property of all corporations for pecuniary profit shall be subject to taxation the same as individuals.' Art. 8, § 2. As the law may be so construed as to leave it in **5. STATUTE: construction.** full force and meaning, it is, of course, our duty to give it such a construction rather than one which shall involve it in conflict with the Constitution. This change or repeal of the act of 1858 was a question not before us in the case upon which counsel rely, and it was not intended by any member of the court to deny such repeal, nor to pass upon the point here ruled as to the act of 1860.

As the property of railroad companies was, therefore, under the act of 1860, to be assessed and taxed like that of all persons, and as this law was in force in 1861, the question still remains as to whether this property, as lands, was subject to taxation for that year.

It will be remembered that the road was completed to the point which entitled the company to a certificate **6. RAILROADS: construction of, land grant act.** showing its right to another one hundred and twenty sections of land, on the 1st of January, 1861. The Governor made his certificate to that effect, April 25, 1861. And in April, 1863, certain lands, (including those taxed) were certified to the company by the commissioner of the general land-office, with the approval of the Secretary of the Interior. And in view of these facts, did the company, or any person, have a taxable interest in these lands for the year named? They were not sold to plaintiff, it will be borne in mind, until in November, 1863.

In view of the language of the act of Congress, and our

own legislation, the question is certainly not free from difficulty. If these lands were the property of the United States, or of this State, then it is·conceded that they were not subject to taxation; for such is the express declaration of the statute. Now, the act of Congress (act of· May 15, 1856, Laws of Extra Session, Iowa, p. 7) declares that there is "hereby granted to the State of Iowa, for the purpose of aiding in construction of railroads, etc., * * every alternate section of land, designated by odd sections," for six sections in width on each side óf said roads. But when the lines of said roads are definitely fixed, if it shall appear that the United States have sold any sections or parts thereof, granted as aforesaid, or the right of preemption has attached to the same, then it shall be lawful for any agent or agents to be appointed by the Governor to select, subject to the approval of the Secretary of the Interior, from the lands of the United States, nearest to the tiers of sections above specified, so much land in alternate sections, to be equal to such as the United States have sold, or otherwise appropriated, or to which the rights of pre-emption have attached, which land shall be held by the State of Iowa, for the uses and purposes aforesaid. But the lands to be located shall in no case be more than fifteen miles from the lines of said roads, and shall be disposed of only as the work progresses. And all lands, before the passage of said act, reserved to the United States, for the purpose of aiding in any object of internal improvement, or for any other purpose, are reserved from the operations of said act. The lands granted are to be subject to the disposal of the Legislature of the State, for the purpose named and no other, and only in the manner following: A quantity of land not exceeding one hundred and twenty sections for each road, and included within a continuous length of twenty miles thereof, may be sold, and when the Governor shall certify to the

Secretary of the Interior, that any continuous twenty miles of any road is completed, then another quantity of land hereby granted, not to exceed one hundred and twenty sections for such road, having twenty continuous miles completed as aforesaid, and included within a continuous length of twenty miles of said road, may be sold; and so from time to time, until said road is completed. But if any road is not completed within ten years, no further sale shall be made. and the lands unsold revert to the United States.

By the act of July 14, 1856 (Laws Extra Session 1856, p. 1), this grant was accepted upon the terms in said act of Congress contained; and the lands granted to aid in the construction of a road from Dubuque to the Missouri river were disposed of, granted and conferred to and upon the Dubuque and Pacific Railroad Company, a body corporate, &c. The lines and routes of the several roads are required to be definitely fixed by the first day of the next April; maps and plats showing such lines are to be, by the date aforesaid, filed in the office of the Governor and Secretary of State, such location being considered final only so far as the limits and boundary within which lands may be selected. In the event that the lands cannot be obtained within the limits and along the line aforesaid, the Governor is required to appoint agents from time to time to make the selections authorized by the act of Congress. The grant is upon the express condition that if the company shall fail to have completed and equipped seventy-five miles of its road within three years from the 1st day of December, 1856, thirty miles in addition in each year for five years, and the remainder on the 1st of December, 1865, the State may resume all rights conferred upon the company so failing, and all rights to the lands granted and remaining undisposed of by the company so failing as aforesaid. The right of pre-emption is recog-

nized, the mode of proving the same pointed out, and the proper certificate thereof, when filed with the secretary of the company, entitles the holder to the possession *until the title becomes vested in the company*, and upon paying therefor the pre-emptor is entitled to a patent from the company, which will vest in him all the title of the company in and to such lands.

In giving a construction to this federal and State legislation, it does not seem to be material to determine whether the fee passed to the State, in virtue of, and by force of the act of May 15, 1856, or whether any other act or conveyance was necessary to pass the title to the State to the lands so granted. For, conceding this to be the effect of the act, we are still to determine when the title passed from the State, and a taxable interest was acquired by the company, the lands being no more subject to taxation while · held by the State than when held by the United States. Was this taxable interest, then, acquired by the company by force of the act of the legislature of July 14, 1856. In other words, did this act so operate as to pass at once a title to these lands, which immediately became liable to taxation? And though this question should receive a negative response, we should still have to advance one step further, and inquire whether, under the federal and State legislation, this taxable interest was acquired by the completion of this twenty miles of road, as stated in the petition. For it will be remembered that all this legislation and such completion took place prior to the assessment of 1861. And, therefore, if the completion of so much of the line under the law vested not a legal title, but any title subject to taxation, then this tax was properly assessed, and to this extent the demurrer was properly sustained.

And in the determination of this question it is proper to remark that both parties, in construing the act of Con-

gress, concede the right of the company to these lands, though located about one hundred miles west of the fifth completed continuous twenty miles. In other words, plaintiffs claim and defendants do not deny, the right of the company to select and obtain certificates for land more than twenty miles west of its completed line. And it therefore becomes unnecessary for us to construe this act, basing our decision, as we do, so far as the construction of the law is concerned, upon that claimed on the one hand and conceded on the other.

Upon the completion of the twenty miles of road then, the company had a right to take lands in Webster county. 7 — when the right of the company attaches: taxation. This was its right under the act of Congress, and our State legislation. And this right was afterward recognized, for it did acquire in 1863 (if not before), by the action of the department at Washington, the full legal title. Having then completed so much of the road on the 1st day of January, 1861, could the State and counties legally tax the one hundred and twenty sections of land to which the company became entitled by virtue of such completion? But one argument of much apparent force occurs to us against the exercise of the power, while the reason, language and policy of the law, all seem to us to favor it. The argument against it is, that not until the lists are finally approved and certified by the commissioner, can it be definitely known to what precise lands, by sections or parts of sections, the company will be entitled. This is more particularly true as to lands outside the six miles, on either side of the line of the road. And as to each, the uncertainty is increased by the fact, that it is not authoritatively determined what reservations had been previously made for the purposes named, nor to what extent pre-emption right had attached. And yet it is undeniably true, that upon the completion of so much of the

line (within the time, and in the manner fixed by the act, as to which there is no question), the company was legally and absolutely entitled to this quantity of land. And if the several acts had designated the particular tracts to which, from time to time, the company would become entitled, there could remain no doubt, that the completion of any twenty miles would vest such an interest to the lands thus set apart therefor, as would make them at once liable to taxation. And this, too, though the certificate of the Governor, and the final certificate at the department at Washington should not be made for months afterward. In other words, these subsequent acts would be but the perfection of the *evidence* of title, while the *fact* of completion would form the true basis of the right, and at once vest the interest. Just as if A pays in full, according to his contract with B, for a tract of land. A thereby acquires an interest, though the legal title remains in B, and may so remain for days and months. The subsequent conveyance by B to him vests the legal title, it becomes the evidence of a full title, but the *fact of payment* creates the interest, conceding there was none by the contract itself. And as A, in the case supposed, could enforce a conveyance against B, so could the company, upon the completion of so many miles of road, unless some legal objection obtained, enforce the required certificates, and thus obtain the full evidence of title.

The language of the law is, that, aside from certain exemptions, all other property, real and personal, is subject to taxation. And this means property to which a party may have an equitable, though not a legal interest, and lands bought from the State, whether on credit or otherwise. Rev., § 712, cl. 8, § 29. And it is said that this property in lands includes every species of title, inchoate or complete, those rights which lie in contract,

executory as well as executed. *Stockdale* v. *Webster County*, 12 Iowa, 536; and see *Adams* v. *Beall*, 19 Iowa, 61; *Burton* v. *Hintrager*, 18 Id., 348; Blackwell on Tax Titles, 426, 542, 424; *Dubois* v. *Hepburn*, 1 Pet., 1; *Neismanger* v. *Gwynne*, 13 Ohio, 74.

The rule is, that the taxing power operates upon all property within the territorial limits of a State, and that no property is to be regarded as exempt from this power unless by virtue of some positive law. The exemption never raises by implication. Blackwell, 540. What title the purchaser at a tax sale might take, whether a full legal title, or the equity merely which was held at the time by the owner, is not material now to determine, for at present we are alone inquiring whether this property was or was not exempt from taxation for the year 1861. And our opinion is, under the act making the grant to the State, and the subsequent act of the legislature, that at least when the company completed this twenty miles of road, all of the one hundred and twenty sections to which it became entitled by virtue thereof, was liable to taxation. In other words, that while it might be necessary thereafter for the company to procure further evidence of title, it, by the fact of completing its line to this extent, acquired a right or interest in these lands, which was subject to taxation.

If it be said that it was not then known what specific tract would be obtained, the answer in the first place is, that the company did afterward obtain certificates for these very lands, based upon and in consequence of this work, and the interest thereby created. If the county had assessed the wrong land—lands to which the company had and acquired no interest, then of course the levy would have been fruitless, and no lien would have resulted. Then, again, we know as a matter of fact, that selections have been made according to the terms of these

acts; that these selections are and have been withheld from sale by the general government, and it is thus known definitely from what tracts the lands are to be taken. All these lands are known as railroad lands, and the plats thereof are to be seen at any time in the several land-offices of the district through which the road runs. And, therefore, there need be but little if any difficulty, after one section of twenty miles is completed, and the selections therefor made, in knowing just when the next installment commences and ends. Not only so, but if these lands are not liable for their due burdens until the company obtains the required certificate from the federal officers, then this step might be delayed indefinitely, and the company would have many if not all the advantages of ownership, without being liable to perform this most rightful duty—a duty undeniably devolving upon all those owning an interest in property real or personal.

We therefore conclude, without passing upon the question whether the company acquired a taxable interest by virtue of the legislative act, that these lands were liable from the time of completing the section of twenty miles named, or from the 1st day of January, 1861. And so holding, it follows that to this extent the demurrer was properly sustained. As to the other years, the lands, as such, were not properly taxed, and thus far the demurrer should have been overruled.

The order sustaining the demurrer to the entire petition is, therefore, reversed, and the cause remanded, with directions to proceed in accordance with this opinion.

Reversed.