## JUNE TERM, 1875.    153

The C. R. & M. R. R. Co. and The I. R. L. Co. v. Carroll Co.

The C. R. & M. R. R. Co. and The I. R. L. Co. v. Carroll Co. et al.

1. **Taxation**: LAND GRANT: WHEN LANDS BECAME TAXABLE. The lands granted to the C. R. & M. R. R. Co., by the Act of Congress of June 2, 1864, did not become subject to taxation until they were selected or ascertained to be the lands embraced in the grant. The earliest evidence of their identification is the certificate of the Commissioner of the General Land Office, approved by the Secretary of the Interior. Following *C. R. & M. R. R. Co. v. Woodbury Co.*, 29 Iowa, 247.

2. ———: ———: ———. When the railroad company became entitled to any portion of the lands granted by Act of Congress of May 15, 1856, by the completion of any part of its road as prescribed by federal or state legislation, such portion of the grant thereupon became subject to assessment and taxation.

3. ———: ———: SELECTION OF LANDS. It was the intention of the act that the railroads should be constructed westward from the initial eastern point and that the one hundred and twenty sections granted for the construction of each twenty miles of road should be selected from the unoccupied lands adjacent to the part thus constructed. BECK and DAY, JJ., *dissenting*.

   *Argument* 1. The language of the act indicated that the roads were to be constructed "from" the eastern "to" the western terminus.

   *Argument* 2. Grants of land are to be strictly construed and most strongly against the grantee.

   *Argument* 3. The grant for each twenty miles was *not to exceed* one hundred and twenty sections, indicating that the selection should be made from the lands lying along the road thus constructed, even though the amount might be less than the maximum thus fixed.

   *Argument* 4. The selection of the lands adjacent to the road as it progressed from east to west would create an early demand and sale for Government lands.

   *Argument* 5. If the grantee were allowed to select the lands anywhere along the line of the road, no lands could be identified until thus selected, and no right of taxation would accrue until the whole road was completed.

4. ———: ———: ———. The State could not pass any title to or right in the lands except in the manner authorized by the Act of Congress.

5. ———: TAX SALE: WARRANT. The tax warrant is not an essential element in a tax sale, and its form, or existence even, is immaterial. (*Parker v. Sexton*, 29 Iowa, 421; *Johnson v. Chase*, 30 Id., 308; *Hurley v. Powell, Levy & Co.*, 31 Id., 64.)

6. ———: ASSESSMENT: EVIDENCE. Where the assessor or other proper officer failed to assess certain lands and the treasurer discharged the duty within two years, but failed to note the fact that the assesssment was made by himself, *held*, that the omission did not affect the legality of the assessment and that the fact and time when it was made could be shown by parol.

7. ———: IRREGULARITIES: EQUITY. Equity will not interfere to restrain the collection of taxes authorized by law, on account of errors or irregularities in the assessment.

8. ———: PENALTIES: WHEN THEY COMMENCE TO RUN. Where lands omitted by the assessor or clerk have been placed upon the tax list by the treasurer, penalties commence to run from the time when such entry was in fact made.

9. ———: MANNER OF ADVERTISEMENT. When taxes are delinquent upon a whole section, belonging to one owner and lying in one contiguous body, it is the duty of the treasurer to advertise the whole tract in a single description.

10. ———: ROAD TAX: RETURN. When a road tax has been legally levied and unpaid, equity will not relieve a taxpayer from the payment of such tax on account of irregularities in its return by the township clerk to the treasurer.

11. ———: SCHOOL TAX: WHO MAY FIX THE RATE. The board of directors are alone authorized to fix the rates of tax to be levied for teachers' and contingent funds, and where this function was assumed by the Board of Supervisors the tax was held to be void.

12. ———: SCHOOL HOUSE TAX. If the electors of the district shall neglect or refuse to vote the proper school house tax after it shall have been properly certified, the board of directors shall then ascertain and apportion the amount.

13. ———: EQUITY. Where the statutory provision for the collection of taxes is plain, speedy and adequate, equity will not interfere to enforce their collection.

14. ———: PENALTIES: REPEAL OF STATUTE. The repeal of a statute under which penalties had accrued for the non-payment of taxes, will not affect the liability of the owner for the amount of such penalties.

15. ———: FAILURE TO SELL. That the treasurer did not sell land upon which taxes were delinquent would not prevent the accumulation of penalties.

16. ———: ACCUMULATION OF PENALTIES: EQUITY. That penalties have largely accumulated while litigation has been pending respecting the validity of the tax, will not justify a court of equity in remitting or diminishing them.

*Appeal from Carroll District Court.*

MONDAY, JUNE 21.*

The plaintiffs bring this suit in equity to restrain the defendants from selling plaintiffs' lands, situated in Carroll county, for the non-payment of taxes thereon for the years 1866 and 1867.

A temporary writ of injunction was ordered, and upon the final hearing of the cause, on the petition, answer, cross demand, answer thereto and evidence, the injunction was made perpetual as to some of the taxes and dissolved as to the others. Both parties appeal.

*Isaac Cook, N. M. Hubbard* and *E. S. Bailey,* for plaintiffs.

The levying of taxes is a statutory power, depending alone upon the prerogative of the state and the letter of the law for its support. (Blackwell on Tax Titles, 33, and cases cited.) The constitution and laws of this state have not imposed upon courts of equity the duty of levying and collecting state and county taxes. When the statute speaks of taxes "for the preceding year," it means taxes then actually levied, and not such as might or ought to have been levied. A tax not levied is no tax at all, and cannot be said, under any circumstances, to be unpaid or delinquent. (*Miller v. Hale,* 26 Pa. St., 432; *McCall v. Lorimer,* 4 Watts, 352.)

No person's property can be taken under the name of tax without a substantial compliance with the statute by which the tax is imposed. Road taxes can only be levied by the Township Trustees, and can only be placed upon the tax lists of the county from a certificate of the township clerk, describing the property on which the tax is delinquent, and designating the road district in which each tract of land is situated. (§§ 891, 898; Chap. 163, Laws of 1862, and Chap. 76, Laws of 1868.)

School taxes levied by the Board of Supervisors, upon the authority of the certificate of the Secretary of the District

Township, setting forth the rate of taxation as fixed by the Dist. Township under the law, are not legally levied and are uncollectible. The electors of the district, at their annual meeting on the second Saturday in March, fix the rate of school house tax to be levied, not exceeding 10 mills on the dollar. The Board of Directors of the District Township, at their meeting on the third Monday of March, fix the rate of contingent tax and teachers' tax to be levied. The Secretary of the District Township certifies to the Board of Supervisors the rate of taxation thus fixed, and upon this certificate the Board of Supervisors are required to levy the per centum thus certified. (Chap. 172, Laws of 1862, as amended by Chap. 143, Laws of 1866.)

That the school house tax levied by the Supervisors corresponds in the rate levied in all the townships with the rate stated in the certificates, where the rate was fixed by the Board of Directors, does not render it a valid tax. The electors alone can vote the tax.

A tax warrant, *i. e.*, both the formal warrant and the lists describing the property and taxes levied upon it, will not justify the enforcement of a tax, unless it describes the taxes with such certainty that both the officer and the persons against whom the taxes are levied can distinguish between the taxes intended to be included in the warrant and those that may afterwards be written in the lists. The statute (Rev., § 752), which requires the county treasurer to assess any property omitted from the lists, and note opposite the tract the words, "by treasurer," is mandatory. The tax lists must show both the assessment by the treasurer and the time when it was made. When it appears upon the face of tax records that the proceeding was irregular in any respect, parol evidence is inadmissible for the purpose of supplying the defect, or in any manner to aid by explanation; and where the law requires the proceeding to be recorded, the title of the purchaser must stand by the record itself, oral evidence being inadmissible where the officer omitted to record the originals, or recorded them defectively. (Blackw. on Tax Titles, 512; *Massie's Heirs v. Long,* 2 Hamm., 287; *People v. San Fran. Sav.*

*Un.*, 31 Cal., 132; *Minor v. McLean*, 4 McLean, 138; *Coit v. Wells*, 2 Vt., 318; *Kellogg v. McLaughlin*, 8 Ohio, 114.) The principle is the same under the operation of the tax laws, whether the amount involved be the portion which the State exacts under the name of a tax or the whole estate which is lost by non-payment. Where the law requires the evidence of a fact to be in writing, oral evidence cannot be substituted. (1 Green. Ev., § 36.) The language of the statute is that the treasurer is *required* to note the words " by treasurer." There is no other way of showing it was done within the required time save by parol proof. Presumptions are never entertained in favor of a tax, without positive statute. (Blackw. Tax Titles, 70, and cases cited.)

That portion of these lands included within the grant of June 2, 1864 (U. S. Stat. at Large, p. 96), were not taxable before the year 1869 (*Railroad v. Woodbury Co.*, 29 Iowa, 247); those embraced in the grant of 1856 were not subject to taxation under previous decisions of this court, not having been earned by the company under the conditions of the grant. The company could not get title more than twenty miles in advance of the completed road. (*Iowa Homestead Co. v. Webster Co.*, 21 Iowa, 221.) The conditions imposed upon the company, including the construction of the road and the certificate of the Governor thereto, are conditions precedent. (*The State ex rel. v. Kirkwood*, 14 Iowa, 162.) The lands of the State are exempt from taxation until title passes from it. (*D. N. & R. Co. v. Polk Co.*, 10 Iowa, 1.) In the case at bar no title at all passed *until* the company acquired full legal title, notwithstanding there may be cases in which one may be the owner and not have complete legal title. (*Carroll v. Safford*, 3 How., 441; *Witherspoon v. Duncan*, 4 Wall., 210.) The statute does not name any act of investiture but the certificate of the Governor. Until the issuance of the certificate the title to the lands was in the State.

The Code must govern in determination of penalties. (Code, Sec. 47.) A statute repealed is as if it had never existed, except with reference to the parts saved by the repealing statute. (*Thatcher v. Haun*, 12 Iowa, 311.) The collection of taxes is

specially provided for by statute, and the statutory remedy must be pursued. The Act of 1862 having been repealed and the taxes having been levied prior to the Code, no penalties could be collected under either statute. (*Flaherty v. Thomas*, 12 Allen, 428; *Commonwealth v. McDonough*, 13 Allen, 581.) While repeal does not invalidate the assessments so as to relieve the taxpayers from the obligation to pay the tax, it is otherwise as to penalties imposed for non-payment. (*Belvidere v. Warren R. R.*, N. J. L., 193.) A mistake of law may be ground for relieving against a forfeiture. (*Scott v. Dunn*, 1 Dev. and Balt., 425, N. C.) Equity will always relieve against a penalty when compensation can be made. (*Hackett v. Alcock*, 1 Call. (Va.), 533.)

*Grant & Smith*, for defendants.

Public lands become subject to taxation by the states after the lands are donated as well as when they are sold, and they are liable to taxation after they are segregated from the mass of public lands. Power to tax exists as soon as the ownership is changed, and this is determined when the entry is made in the terms and modes allowed by law. (*Witherspoon v. Duncan*, 4 Hall, 219.) When lands are granted in such terms as these railroad grants, "the title becomes certain by the location of the road." (*R. R. Co. v. Smith*, 9 Wall, 97.) That the state and its assignee gets a vested title under the railway grants has been decided in exact words by the Supreme Court of Minnesota. The Act of March 26th, 1860, granted to plaintiffs a present estate, subject to be defeated on non-performance of condition, but until breach this was a vested interest. The equitable interest of railroads in land grants is subject to taxation. (*Stockdale v. Webster Co.*, 12 Iowa, 536; *Iowa Homestead Co. v. Webster Co.*, 21 Iowa, 221.)

The proper officers of the county having neglected to tax these lands, it was the duty of plaintiff to have them properly assessed and pay the taxes thereon (Code, § 753); and no failure of the owner to have them assessed, or have the errors of assessment or omission of assessment corrected, as for instance adding

the words, "by the Treasurer," affects the legality of the tax
or a sale therefor. A party who goes into a court of equity
seeking equity must do equity (2 Story Eq. Jur., § 693). A
party in possession of land seeking to avoid in equity a tax
title, must refund all taxes paid by the defendant. (*Taylor v.
Reed*, 66 Ill., 322.) Plaintiffs cannot ask relief from the taxes
assessed where the valuation was not put down, because it
was their duty to have the land properly assessed and pay the
taxes levied (Code, § 753), and because, where the rate of
taxation is carried out, the valuation can be rendered certain
and corrected, and it was the plaintiffs duty to do this if the
officer omitted it. They cannot seek relief from their own neg-
lect.

In levying the road tax the officers are presumed to have
done their duty and the burden is on the plaintiffs to show
that they omitted to do this. The records of the township
being lost, plaintiffs were bound to prove their contents and to
show that no road tax was levied and no return made by the
supervisor and town clerk.

The taxes draw penalties from the time they were due.
There is no court to enforce levies but a court of equity;
therefore the county is entitled to judgment in this action for
all the taxes and penalties on all the lands of plaintiffs which
are not paid.

MILLER, J.—A portion of the lands described in the peti-
tion was acquired by plaintiffs under an Act of Congress of
May 15, 1856, granting lands to the State of Iowa to aid in
the construction of certain lines of railroads across the state,
and under acts of the General Assembly granting the same
lands to certain railroad companies; and another portion was
acquired under Act of Congress of June 2, 1864, granting
lands directly to the Cedar Rapids & Missouri River Railroad
Company. The petition avers that none of these lands were
subject to taxation for the years 1866 and 1867, for the alleged
reason that in those years the lands granted under the Act of
Congress of June 2, 1864, were the lands of the United States,
and those granted under the Act of May 15, 1856, belonged

to the State of Iowa. It is also averred in the petition that the taxes were otherwise illegally levied, and that illegal and oppressive costs and penalties have been added thereto.

· I.   We will inquire, first, whether the lands acquired under the Act of June 2, 1864, were subject to taxation for either of the years 1866 or 1867.

The fourth section of the Act of Congress of June 2, 1864,
· authorized the Cedar Rapids & Missouri River Railroad

1. TAXATION:
land grant:
when lands
became taxa-
ble.

Company to "modify or change the location of the uncompleted portion of its line" as shown by a map on file in the General Land Office; that the company should " be entitled, for such modified line, to the same lands and to the same land per mile," and for the con-
·necting branch " as originally granted" (to the state by Act of May 15, 1856), " to aid in the construction of its main line, subject to the conditions and forfeitures mentioned in the original grant"; that whenever said modified line should be established, etc., the company should file in the General Land office a map definitely showing such modified line, whereupon the Secretary of the Interior was required to " reserve and cause to be certified and conveyed to said company, from time to time, as the work (progressed) on the main line, out of any public lands (then) belonging to the United States, not sold, reserved, or otherwise disposed of, or to which a pre-emption right or right of homestead settlement (had) not attached, and on which a bona fide settlement and improve-
ment (had) not been made under color of title derived from the United States, or from the State of Iowa, within fifteen miles of the original main line, an amount of land equal to that originally authorized to be granted, to aid in the con-
struction of said road by the Act" of May, 15, 1856.   This section further provides that " if the amount of lands per mile granted, or intended to be granted, by the original Act to aid in the construction of said railroad, shall not be found within the limits of the fifteen miles therein prescribed, then such selections may be made along said modified line and connect-
ing branch within twenty miles thereof."   These lands were required " to be selected from *any* of the unappropriated

lands as before described within twenty miles of said main line and branch."

In the case of *The Cedar Rapids & Mo. R. R. Co. v. Woodbury County*, reported in 29 Iowa, 247, it was held that the lands acquired by the plaintiff under this Act did not become taxable until they had been certified or set apart to the company; that previous to being certified by the Secretary of the Interior as directed in the Act of Congress, the lands were incapable of identification, and not taxable.

WRIGHT, J., uses this language: " In this case, according to the averments in the bill, and especially under the Act of June 2, 1864, there was no such identification " (as in the cases of *Iowa Homestead Co. v. Webster Co.*, 21 Iowa, 221), "nor was the same possible, at least until the departments had acted at Washington, if even before the issuing of the certificate. Here the Secretary of the Interior was to reserve lands within fifteen miles of the original main line of the road, equal to that originally authorized to be granted; the company was authorized to change or modify the uncompleted portion of its line, and, if the requisite amount of lands were not found within the fifteen miles, then the selections were to be made along the modified or connecting lines or branch, within twenty miles thereof; and the certificate and conveyance were to be made by the secretary directly to the company, and not to the state."   " This case asks us to extend the rule still further  (than in *Iowa Homestead Co. v. Webster County, supra*), and that the taxing power shall be authorized to enter a field entirely undefined and undefinable, and to hold that all property held by the government, to which a company or individual may ultimately acquire title is liable, while thus held, to taxation."

We will only add, that until the lands granted by the act were selected or ascertained to be *the* lands granted, until they could be identified as lands belonging to the company, they were incapable of being lawfully assessed to them or to any one else, and hence not taxable.

The earliest evidence we have of the indentification of these lands is the certificate of the Commissioner of the

VOL. XLI.—11

General Land Office, approved by the Secretary of the Interior, and dated July 17, 1868. Prior to this time, therefore, the lands acquired under this act were not taxable..

The lands acquired under this act, which are involved in this case, are designated in the exhibits to the petition, by even numbers and odd numbers marked with an X.

II. The next inquiry is in respect to the times when the lands granted to the state, by the act of Congress of May 15, 2. ——:——: 1856 became taxable. Counsel for plaintiff con- ——. tend that the lands only became taxable when the company acquired title thereto, and that, with the exception of the first one hundred and twenty sections, they acquired no title or right to any of the lands, except as the road was built *and certified* by the Governor to the Secretary of the Interior.

In *Stockdale v. Webster Co.*, 12 Iowa, 536, it was held that the legal title is not essential to constitute a taxable interest in real estate; and where the technical legal title to land is in the United States, in trust for its grantees who have the right to demand the legal title, such land is subject to taxation. In the *Iowa Homestead Co. v. Webster Co.*, 21 Iowa, 221, it was held that under the Act of Congress of May 15, 1856, and the Act of the General Assembly of July 14, 1856, the Dubuque and Pacific R. R. Co. became, from time to time, legally and absolutely entitled to a quantity of land, not exceeding one hundred and twenty sections from the completion of twenty miles in the manner contemplated in said acts, and that the certificates of the Governor of the State, and from the Land Department of the General Government, were necessary only *as evidence of a title already existing;* and from the completion of such twenty miles of road, the lands to which the company thereupon became entitled were subject to taxation. This case is cited and approved in *The Dubuque & Pacific R. Co. v. Webster Co.*, Ib., 235; *Cedar R. & M. R. R. Co. v. Woodbury Co.*, 29 Ib., 247.

It is, however, urged by counsel for plaintiff, that the certificate of the Governor to the Secretary of the Interior, showing that a portion of the road had been completed, as required

by act of Congress, was a necessary condition precedent in order to vest the title in the company or to give it any right whatever to the lands; and they cite *The State ex rel. v. Kirkwood, Governor*, 14 Iowa, 162, to sustain this position. That case was an application for a writ of mandamus to compel the Governor to issue certificates to the Cedar Rapids & M. R. Co., to enable that corporation to obtain the legal title to lands to which it claimed to be entitled under the act of Congress and of the state. The Governor refused to issue the certificates demanded, for the alleged reason that the company had failed to comply with the conditions of the act of the General Assembly, and that the company was entitled to the certificates only upon such compliance, and the court held that the corporation, not having complied with the terms of the act, had no right to demand the certificates; that the conditions imposed on the company were conditions precedent to acquiring title or a right to the certificates. We do not, however, understand the case as holding that the issuing of the certificates by the Governor, to the effect that the company had completed a given portion of its road, to be a condition precedent to the company acquiring any right to the land. On the contrary, the case holds, as we understand it, that the company must have done the *work* required of it, before it could acquire any right or title to the land, and until it had so done the work it was not in a position to demand the Governor's certificate as evidence that it had done the work. But when the company had performed the work, as and within the times required by law, it became entitled to the quantity of land designated and also to the certificates provided by law. It follows, therefore, on the principle of these cases, that when the railroad company became entitled to any quantity of the land embraced in the grant, by the completion of any required portion of its road, in the manner prescribed by the acts of Congress and of the state legislature, such lands thereupon became subject to assessment and taxation.

III. The inquiry then arises, when did the railroad company become entitled to the lands in controversy? The solution of this question is not free from difficulty. It becomes necessary

in this inquiry to determine the order in which the lands were authorized to be sold or appropriated by the State to the purposes for which they were granted by the Act of Congress, for it is upon the theory that, upon the completion of a certain portion of the road the company became entitled to a given quantity of land, *which was capable of identification*, the lands thereupon became subject to taxation, (see *The Iowa Homestead Co. v. Webster County, supra*). In other words, upon the completion of a required portion of the road the particular lands to which the company then became entitled were rendered certain under the laws granting them, otherwise they would not be taxable until selected or certified so as to render them capable of identification.

3. ——: ——: selection of lands.

The first section of the act of Congress of May 15, 1856, granted to the state of Iowa, for the purposes therein declared, "every alternate section of land, designated by odd numbers, for six sections in width on each side" of the respective lines of roads intended to be aided by the grant. This quantity of land would give to the state one hundred and twenty sections for every twenty miles of road across the state. It was, however, known to Congress that some of the lands thus included in the grant had been previously sold or disposed of by the United States, under laws theretofore passed, hence it was provided, in the same section containing the grant, as follows: "But in case it shall appear that the United States have, when the lines or routes of said roads are definitely fixed, sold any sections or parts thereof, granted as aforesaid, or the right of pre-emption has attached to the same, then it shall be lawful for any agent or agents to be appointed by the Governor of said state to select, subject to the approval of the Secretary of the Interior, from the lands of the United States nearest to the tiers of sections above specified, so much land in alternate sections as shall be equal to such lands as the United States have sold, or otherwise appropriated, or to which pre-emption rights have attached as aforesaid; which lands (thus selected in lieu of those sold and to which pre-emption rights have attached as aforesaid, together with the sections and parts of

sections by odd numbers as aforesaid and appropriated as aforesaid), shall be held by the State of Iowa, for the use and purpose aforesaid; *provided*, that the land to be so located shall, in no case, be further than fifteen miles from the lines of said roads, and selected for and on account of each of said roads."

Under these provisions of the act, as soon as the lines or routes of the several roads were definitely fixed, it was lawful and proper for the state, by its agents, to ascertain what portion of the lands, included within six miles on each side of the roads respectively, had been sold by the United States, or to which pre-emption rights had attached previous to the grant, and then to proceed and select, subject to the approval of the Secretary of the Interior, from other lands of the United States nearest to the tiers of sections before granted, which had not been sold by the government or to which pre-emption rights had not attached, so much land in alternate sections or parts of sections as should be equal to the lands which had been sold or to which pre-emption rights had attached, within six miles of each side of the respective roads. In other words, the state was authorized to go outside of the tiers of six miles on each side of the road, and nearest thereto, and select, in the manner prescribed, enough lands, still undisposed of by the United States, as should, together with the lands obtained within the six-mile tiers, be equal to every alternate section in odd numbers, within six miles in width on each side of the road, provided this amount of land could thus be had within fifteen miles on each side of the road.

These provisions fix the *amount* of the grant, and provide for the selection and identification of the lands granted, which selection and identification the act intended should be made prior to the disposition of any of the lands by the state.

This section further provides " that the lands hereby granted for and on account of said roads severally shall be exclusively applied in the construction of that road for and on account of which such lands are hereby granted, and shall be disposed of only as the work progresses, and the same shall be applied to no other purpose whatever." So that, although the grant is

*in presenti*—passing the title to the state—the lands could only be disposed of by the state for the specific *purpose* for which they were granted.

In respect to the manner of disposing of the lands by the state, the fourth section of the Act provides: "That the lands hereby granted to said state shall be disposed of by said state *only in the manner following:* that is to say, a quantity of land, not exceeding one hundred and twenty sections for each of said roads, and included within a continuous length of twenty miles of each said roads, may be sold: and when the Governor of said state shall certify to the Secretary of the Interior that any twenty continuous miles of any of said roads is completed, then another quantity of land hereby granted, not to exceed one hundred and twenty sections for each of said roads having twenty continuous miles completed as aforesaid, and included within a continuous length of twenty miles of each of said roads, may be sold; and so from time to time until said roads are completed; and if any of said roads are not completed within ten years, no further sale shall be made and the lands unsold shall revert to the United States."

This section authorized the state to sell a quantity of land, not exceeding one hundred and twenty sections, before any part of the road, for the use of which the sale was authorized, was completed; and after the completion of twenty continuous miles of road then another quantity of land, not to exceed one hundred and twenty sections, was authorized to be sold by the state. The evident purpose of the law was to authorize the sale of the first quantity of land to aid in the construction of the first twenty miles of road in advance of its construction, and a like quantity for the next section of twenty miles of road, and so from time to time as the work progressed and until the road should be completed. The question then arises, from what particular portion of the entire grant did the Act require the first quantity of land authorized to be sold, to be taken, and from what part of the remainder was the second quantity to be sold, and so on? Or might the state select the quantity of land to be sold from time to time at its discretion, for example, first selling the authorized quantity on the

western part of the line of road, then the second quantity on the center, and so on, at the mere discretion of the state? This does not seem to have been the intention of Congress.

The object of the grant, as set forth in the first section of the Act, was to aid in the construction of four main lines of railroad, *from* points named on the eastern boundary of the state *to* points named on its western boundary.     At the time of the passage of this Act it was a fact of public notoriety that the great trunk railroads of the country, which had been gradually stretching their arms from the Atlantic cities to embrace the commerce of the west had already reached the Mississippi river—the eastern boundary of our state— opposite the several starting points of roads intended to be aided by this land grant.     Considering these facts in connection with the language of the Act, the evident purpose of the grant is shown to be to promote the continuous extension of these great trunk lines of railroad across the State of Iowa, thereby securing to the latter an outlet to the markets of the east, for its vast and increasing products.

The language in respect to this particular road is as follows: "From Lyons city " (on the Mississippi river) "*northwesterly to* a point of intersection with the main line of the Iowa Central Air Line Railroad, near Maquoketa; *thence* on said main line, running as near as practicable to the forty-second parallel, *across the said State of Iowa to* the Missouri river," clearly implying that the point named on the Mississippi river should be the initial point of construction, and when we consider the object of the grant in connection with this language and the language of the fourth section of the Act, it is beyond doubt that the road was intended to be constructed from east to west across the state in sections, each of twenty continuous miles. Now, as before remarked, it being the obvious purpose of the Act that the quantity of land authorized to be sold from time to time was so authorized for the purpose of aiding in the construction of a section of twenty continuous miles of road next to be built, and the requirement of the fourth section that the quantity of lands authorized to be sold from time to time should *be included within a con-*

*tinuous length of twenty miles of road*, makes it plain that it was intended the lands should only be sold in the same order prescribed for the construction of the road, that is to say, the lands to be sold were to be taken from the eastern part of the grant.

The land only could be sold for the purposes of aiding in the construction of the road, and then only *as* the work progressed and in the *manner* prescribed in the fourth section. The practical working of the act, after the lands passing to the State under the grant were ascertained, was that the State might sell a quantity of land not exceeding one hundred and twenty sections included within a continuous length of the first twenty miles of the road to be constructed in advance of such construction to aid therein; when twenty continuous miles of the road were completed, then another quantity of land, not exceeding one hundred and twenty sections and included within a continuous length of twenty miles of the road (being the next twenty miles in advance of the completed twenty miles of road,) might be sold, and so from time to time as such continuous twenty miles were completed.

This construction is in harmony with, and gives effect to, all the provisions of the act. It accords with the object and purpose which the national legislature, as indicated by the act, had in view in making this grant, and is in accord with the rule that grants of land by Congress are to be strictly construed and most strongly against the grantee. *The Dubuque & Pacific R'd Co. v. Litchfield*, 23 How. (U. S.), 88. See also, *Sandford v. Martin*, 31 Iowa, 67; *Gildart v. Goldstone*, 11 East., 685; *Hagan v. Campbell*, 8 Port., 9; *Townsend v. Brown*, 4 Zab., 80; Greene's Estate, 4 Med. Ch., 349; *May, etc. v. Ohio & P. R. Co.*, 26 Penn. St., 355.

If it be said that, on the end of the line of road where many of the public lands had already been sold by the United States, the State might not be able, under the above construction, to sell one hundred and twenty sections, the quantity of land intended to be applied in aid of the construction of each twenty miles of road, it is answered that this result is contem-

plated by the act when it says that a quantity of land *not exceeding* one hundred and twenty sections, and included within a continuous length of twenty miles of the road may be sold, etc., clearly requiring that in selling the land the State should in each sale be confined to such lands as should be obtained within a continuous length of twenty miles, though the quantity should be less than one hundred and twenty sections. Under the various provisions of the act the quantity *might* be less, but it could not exceed that quantity.

The provisions of the first section authorizing the selection of lands outside of the six-mile tiers in lieu of those sold by the Government within that limit, have reference to the filling up of the grant as near as may be, but have no reference to the manner of *disposing* of the same by the State, as the *work* progressed.

Again, the second section of the act provides that the lands which should remain to the United States within the limits of the grant on each side of the road should be sold at two dollars and fifty cents per acre, when sold, being double the minimum price of public lands, which would leave the public revenue from this source substantially the same as if the grant had not been made. By taking the lands granted along the eastern end of the road, and so from time to time as the work progressed, the lands remaining to the Government would, by the construction of the road, be sooner in demand and meet early sales, resulting in direct advantage to the Government. It is fair and reasonable to conclude that the Government thus expected to derive this advantage from the building of the road, *i. e.*, the creation of an early demand for its lands at double the usual price.

It cannot be doubted that the act of Congress fairly admits of the construction here given to it. To my mind it is the only reasonable one, and is in accord with *The Iowa Homestead Company v. Webster County, supra;* for, if we construe the act so as to allow the lands to be sold or appropriated from any portion of the line of the road as the company may elect to take them, then they would be incapable of identification until selected and certified and consequently not liable to be

assessed for taxation until thus identified. The company would acquire no right to them until selected and certified, or until the entire road was built.

The lands granted were to be held by the State for the use and purpose of the grant, and the State, in the execution of the trust, was authorized to sell them from time to time in the manner prescribed by the act of Congress. Instead of holding the lands and making sales thereof, in the manner contemplated by the act of Congress, the State legislature passed an act, July 14th, 1856, by which the lands granted to aid in the construction of a railroad from Lyons City northwesterly, etc., were "disposed of, granted and conferred upon the Iowa Central Air Line Railroad Company."

On the 17th of March, 1860, the General Assembly passed an act resuming this grant, because of the failure of the corporation to comply with the conditions of the acts of Congress and the State.

And by Chapter 37, Laws of 1860, these rights, lands, etc., were conferred upon The Cedar Rapids & Missouri River R. Co., upon certain conditions. The fifth section of that act provided that the company should "not become entitled to the first hundred and twenty sections authorized by act of Congress to be sold until such first section of their road should be completed, at which time they shall become entitled to the first apportionment of land." The State, while it might thus require a section of twenty continuous miles of road to be built before the company should be entitled to the land, could not pass any title to, or right in the lands to the company, except as, and in the manner, the act of Congress authorized the State to sell the lands. The company, therefore, could only acquire a right to the lands which the State was authorized to sell and only at the times and in the manner such sales were authorized.

When the act of March 26th, 1860 was passed, a line of railroad had been constructed from Clinton on the Mississippi river westward to Cedar Rapids, on the Cedar river, and that act required the Cedar Rapids & Missouri River R. Company to complete and equip forty miles of its road along its route and

west from some convenient point on the Cedar river near the 42d parallel within one year from first day of December, 1860, or by the first day of December, 1861, thirty miles additional each year thereafter for two years, and the remainder of their road by the first day of December, 1865. The grant to the company was made on the express condition that if the company failed to so build their road it should be competent for the State to resume all rights thereby granted and remaining undisposed of.

As already stated, the company was to have no lands until it should construct one section of twenty miles of its road. Then, according to the construction we have given to the acts under which the company acquired these lands, it became entitled to the lands along the line of its completed road as the work progressed. When it had completed one section of twenty continuous miles it was entitled to a quantity of land not exceeding one hundred and twenty sections included within such twenty continuous miles of road, and so from time to time until the road was completed.

It is admitted of record that the road from Cedar Rapids—the point where the construction of the road commenced—to the Missouri River, is 270 6-10 miles in length; that the distance from Cedar Rapids to the east line of Carroll county is 163, to Nevada, 100 miles, and to Boone, 120 miles. It is also admitted that the first 20 miles of road west from Cedar Rapids was completed September 19th, 1861; that one hundred miles were completed August 31, 1864, and that on the 3d of June, 1865, six sections of twenty continuous miles each, making one hundred and twenty miles west from Cedar Rapids, were completed. It does not clearly appear from the admissions of the parties or the evidence at what precise date the remaining sections of the road were severally completed, but it is admitted that the next seven sections of twenty miles each and 6-10 miles—making 150 6-10 miles, were completed on the 5th day of February, 1867.

When the first six sections or 120 miles were completed, which was June 3, 1865, the west end of the road was within 49 miles of the most easterly end of the lands in controversy.

The lands are all situated in ranges 34, 35 and 36, west of the 5th P. M.  It will thus be seen that in the years 1861, 1862, 1863, 1864 and 1865, the company built and completed six sections, being 120 miles of their road. from the eastern end to within 49 miles of these lands, and that between the 3d day of June, 1865, and the 5th day of February, 1867, a period of about twenty months, they completed over seven sections, or more than 150 miles of the balance of the road; that in the construction of these last seven sections the time occupied in doing it extended over into the year 1867 only one month and five days.  These facts render the inference that the road was so far completed in 1866 as to entitle the company to these lands in Carroll county so strong, that we are, in the absence of any rebutting evidence, compelled to so find. Having completed six sections by June 3, 1865, the company would only have to complete four sections more by the 1st of January, 1867, to then entitle them to these lands in Carroll county.  This they must have done, for if they had done no more than this it would have required the building of over 60 miles in the remaining 36 days.  In the absence of evidence we will not presume that the company constructed these last seven sections of their road from the west toward the east, but will presume that they continued to comply with the requirements of the law in respect to the order of con- structing the road, as the evidence shows they did in building the first six sections, viz: from the east westwardly.

Upon the evidence and the admissions of record, I find that the lands acquired by the company, belonging to the grant of May 15, 1856, became liable to be assessed for taxation for the year 1867, but do not find sufficient evidence to hold them liable for the year 1866.

IV.  Counsel for plaintiff in their argument say, in sub- stance, that if any of the lands should be held liable to taxation for any of the years for which taxes are charged against them, there are such fatal irregu- larities and illegalities as render the assessment and levy void; and it is first insisted that the tax warrant confers no authority

5. ——: tax warrant.

on the treasurer to advertise or sell plaintiffs' lands for any of the taxes.

This question is no longer an open one. In *Parker v. Sexton & Son*, 29 Iowa, 421, it was held that the tax warrant is not an essential step or fact in a tax sale. The power of the treasurer to sell is derived from the statute directly, and it is immaterial whether the tax warrant has a seal or was issued by order of the Board of Supervisors, or even whether there was a tax warrant at all. See, also, *Johnson v. Chase*, 30 Iowa, 308; *Hurley v. Powell, Levy & Co.*, 31 Ib., 64.

V. It is alleged in the petition that the lands in controversy had not been assessed or entered on the tax lists before the same went into the hands of the county treasurer, that they were not entered or transcribed upon the tax lists of 1866 or 1867, by the county clerk when said lists were made, and that there is nothing on the tax list to show that the lands were assessed by the treasurer as by law is necessary when lands may be assessed by the treasurer.

Section 752 of the Revision provides that, "it shall be the duty of the county treasurer to assess any real property subject to taxation, which may have been omitted by the assessors or the county clerk and to collect taxes thereon, and in such cases he is directed to note opposite the tract or lot assessed, the words, " by treasurer." This section was amended by chapter 104, Laws of 1866, by adding the following: " *Provided*, that such assessment shall be made within two years after the tax list shall have been delivered to him" (the treasurer) "for collection, and not afterwards." By these provisions the treasurer is empowered to assess any real estate which may have been omitted by the assessor or the county clerk. This power, however, is limited to two years from the time the tax list was delivered to the treasurer. It is admitted by defendant that the lands in controversy were not placed on the tax list until after it came into the treasurer's hands, but it is claimed that they were placed thereon by the treasurer under the above power. The testimony of the treasurer shows that the assessments were made by him, and that it was so done within two years from the receipt of the

list for 1867. There is no entry on the list of the time when the lands were entered thereon, nor is it noted that the assessments were "by the treasurer."

It is insisted by counsel for plaintiff, that in order to a valid assessment of the land, under the above section of the statutes, the *record* should show the assessment to have been made by the treasurer; that the omission of these words from the record renders the assessment invalid, and that the assessment was the act of the treasurer cannot be shown by parol.

We have already seen that a part of the lands in controversy were subject to taxation for the year 1867. This being so, the statute provides (Revision, section 753) that, "in all cases where real property subject to taxation shall not have been assessed by the township assessor, *or other proper officer*, it is hereby made the *duty of the owner thereof*, by himself or his agent, to have the same *properly* assessed *by the treasurer, and to pay the taxes thereon.*" In view of this provision the plaintiff cannot, in a court of equity, be heard to insist that he ought not to pay the taxes on these lands because the treasurer has not *properly* assessed them. If the treasurer committed an error or failed to assess the lands *properly*, it was the duty of the plaintiff "to have the same properly assessed by the treasurer;" and it is made the further duty of the plaintiff to "pay the taxes thereon."

The same section of the Revision further provides that, "no failure of the owner to have such property assessed, or to have the errors in the assessment corrected, and no irregularity, error or *omission* in the assessment of such property shall affect in any manner the legality of the taxes levied thereon." The omission, therefore, of the treasurer to enter opposite each tract of land assessed the words "by treasurer," does not in any manner affect the legality of the taxes on the land. See *Eldridge v. Kuehl*, 27 Iowa, 160. See, also, Revision, Sec. 762.

Under these provisions of our statute a Court of Equity will not interfere to prevent the collection of taxes authorized by 7. ——: ir- law, and to which the property is legally liable, on regularities: equity. account of errors or irregularities in the assessment. *Conway v. Younkin*, 28 Iowa, 295.

The C. R. & M. R. R. Co. and The I. R. L. Co. v. Carroll Co.

The provision of the statute, directing the treasurer to note that the assessment was made by him, is not essential to the validity of the tax. It is merely directory and formal. In case of defects or informalities in the assessment or levy of a tax, not impeaching its justness, and where the plaintiff ought to pay it, equity will not interfere, but will leave him to his legal remedies if there be any. See Dillon on Municipal Corp., Sec. 738, and cases cited in note 2, on p. 689.

What has been said above in regard to the failure of the treasurer to note that the assessment was made "by treasurer," applies equally to other irregularities complained of, such as that footings of the columns of the valuation and taxes in the assessment roll of 1867 were made before some of the lands in controversy were placed thereon by the treasurer, and that the footings were not afterwards changed. Under the provisions of the statute, these and other like irregularities do not affect the legality of the taxes.

VI. The petition further charges that the treasurer of the. county, in advertising the lands for sale, has computed the interest or penalty upon the same from the time the taxes would have become delinquent, had they been properly assessed by the township assessor, or placed on the tax list by the county clerk, before the first day of November, 1867. The answer admits this to be true, and claims the right to collect these penalties. We are of opinion that no interest or penalty is properly chargeable on the lands, prior to November 1, 1868, which, from the evidence, appears to have been the time when the lands were placed on the tax list by the treasurer. The work of placing the lands on the tax list was commenced prior to, but completed about this time.

Taxes bear interest only from the time they become delinquent (Revision, section 760; Sec. 18, Ch. 45, Laws of 1862). They cannot be properly said to have become delinquent before they were assessed. The interest, therefore, should be computed from the first day of November, 1868.

VII. It is alleged in the petition, and shown by the proof, that at the time the treasurer placed plaintiffs' lands on the tax books, he knew them to be those

of plaintiffs; that the lands are comprised mostly in whole sections; that they are advertised in forty-acre tracts, thus creating illegal and oppressive costs on the plaintiff.

Section 764 of the Revision required that the advertisement should   *   *   *   contain a description of the several parcels of real property to be sold *as the same were recorded on the tax list*, etc , and the treasurer was required to charge and collect the sum of twenty cents for each tract of land thus advertised, etc.   By section 4, of Ch. 24, Laws of Extra Session of 1861, this amount was changed to ten cents, and the county was to pay costs of advertising, but it was made " the duty of the treasurer to act in good faith, and procure the publication of the delinquent tax list for the lowest sum in his power, *   *   *   and in " giving notice of the sale of lands or town lots for taxes, it shall be the duty of the treasurer, in cases where the name of the owner of any delinquent lands *   *   * is unknown, to embrace the largest quantity practicable, in such description of such lands, etc."   The fifth section repeals that clause of section 764 of the Revision, which required the treasurer to advertise lands " as the same are recorded on the tax list."   The second section of Ch. 115, Laws of 1864, fixes the compensation of printing the tax list at 20 cents per each tract of real property advertised for sale.   Now one section of land in a contiguous body is one " tract " or " sub-division" or " parcel," as much as forty acres.   *Corbin v. De Wolf*, 25 Iowa, 124; and, under the provisions of the statute above referred to, it was the duty of the treasurer to so advertise the lands for sale for delinquent taxes as to incur as little costs as were reasonably practicable, consistently with a due and legal advertisement under the law; and the manifest spirit of the statute required that when taxes were due and delinquent upon a whole section of land, or a half, or a quarter thereof, in one contiguous body belonging to the same owner, the treasurer is not authorized to advertise such lands in the smallest sub-divisions, thus creating unnecessary and oppressive costs, but should advertise the whole tract in a single description.

VIII.   Counsel for plaintiff insist that the road taxes

charged against the lands are illegal for the reason that they were not levied by the township trustees and that there are no lists on file in the Auditor's office of delinquent road taxes for 1867 which include any of plaintiff's lands. · The fact that no such lists are on file is admitted by the defendant. It is admitted by plaintiffs that the records of Newton township of said county for the years 1865, 1866 and 1867, are lost. It is shown by the affidavit of J. W. Morton that he was township clerk of Jasper township in said county for the year 1867; that he knows of his own knowledge that a road tax of three mills on the dollar on all the taxable property in the township for that year was levied; that he placed the same on the proper tax list; that he knows of his own knowledge that the road supervisor returned said list with the taxes paid and unpaid to the Board of Supervisors, and that the witness certified the levy of three mills, made by the trustees, to the Board of Supervisors during the year 1867, and in the time required by law.

The auditor also certifies that he finds "in the township clerk's records of Jasper township * * a levy of three mills on the dollar on all the taxable property in said township as road funds." (Signed by the trustees and clerk.)

The affidavit of J. B. Hampton shows that he was township clerk of Newton township for 1867, and that he verily believes that the trustees of said township levied a tax of three mills on the dollar on the taxable property of said township for road purposes for that year, and that he complied with the law as township clerk in the matter of listing and returning the said road tax, etc. The affidavit of I. Hampton, a trustee of the same township for 1866 and 1867, states that the board of trustees at their regular meeting in April of each of said years made a levy of three mills on the dollar on the taxable property of the township for road purposes, and instructed their clerk to make the proper list and report to the Board of Supervisors.

In respect to Union township, the only other township in the county, there is the following evidence:

"At a regular meeting of the trustees of Union township,

Carroll county, Iowa, there was a tax levied of three mills on the dollar, on the assessment of 1867, as a road and bridge tax, and to purchase plows and scrapers for the benefit of Union township, Carroll county, Iowa.

"(Signed,)                             JOHN A. SMITH,
                                         *Township Clerk.*"

And indorsed as follows:

"Filed in my office this 2d day of April, 1867.
                                   WM. HENRY PRICE,
                     *Clerk of the Board of Supervisors.*"

In addition to the above evidence there are tax lists for certain road districts showing the levy of a three mill tax on property described in the lists, none of plaintiff's lands being included. Now we do not understand the plaintiff as objecting to the competency of any of the foregoing evidence so far as it tends to show the levy of the road taxes by the several boards of township trustees, but it is claimed that the law was not complied with in respect to returning the delinquent road tax.

The first section of chapter 163, Laws of 1872, confers the power on the township trustees in each township to "determine upon the amount of property tax to be levied for roads, bridges, plows and scrapers, and for payment of any indebtedness previously contracted by such township for road purposes, and levy the same, which shall not be more than three mills on the amount of the township assessment for that year, etc." The second section provides that if the portion of such tax as is payable in money is not paid "by the first Monday of October in each year, the supervisor shall report the same to the trustees as non-resident lands, and the tax thereon shall be collected in the same manner   *   *   *   as in case of non-resident lands."

By section 1, Ch. 76, Laws of 1868, "the township clerks shall, on or before the second Monday of October in each year, make out a correct list of all non-resident lands and town lots, on which the road tax has not been paid, and the amount of tax charged on each piece of land and town lot, designating the district in which said land or town lot is situated, and

transmit a certified copy of the same to the clerk of the Board of Supervisors of the proper county, who shall enter the amount of tax on each piece of land and town lot on the tax list * * * which shall be collected by the treasurer in the same manner that county taxes are collected."

Now, we are of opinion that the evidence sufficiently establishes the fact that the road taxes in each township were in fact levied by the trustees for the year 1867, and it is equally clear that they have not been paid by the plaintiff. It is not even so alleged. In this state of facts the plaintiff cannot claim, in a court of equity, to be relieved of proper and just road taxes charged against its property, on account of irregularities in returning the same by the township clerk to the clerk of the Board of Supervisors. Notwithstanding irregularities in making the returns, the taxes were legally levied. They have not been paid by the plaintiff. It is sought to avoid payment on account of irregularities in the report of the township clerk. This is not equity, and cannot be admitted.

Had there been no assessment or levy the case might be different, but having been a legal assessment and levy a court of equity will not relieve the owner of the land from the payment of the taxes, though there may have been irregularities in the mode of returning the same.

IX. It is next insisted that the school taxes charged against plaintiffs' lands are illegal.

The school laws authorize the board of directors of the district township, at their meeting on the third Monday in March, to fix the rate of contingent tax and tax for teachers' fund to be levied.

11. ——: school tax.

The *electors* of the district township, at their regular meeting on the second Saturday in March, have power "to vote such tax not exceeding ten mills on the dollar * * * as the meeting shall deem sufficient for the purchase of grounds and the construction of the necessary school houses for the use of the respective sub-districts," etc. See sections 7 and 19, Ch. 172, Laws of 1862, and section 1, Ch. 143, Laws of 1866.

There were three district townships in the county. There

were certificates on file from each of these districts. The first illegality complained of is that the Board of Supervisors levied teachers' tax and tax for contingent fund of one mill on the dollar for teachers' and contingent funds in Jasper district township, without any authority of law, no such tax having been voted or fixed by the directors. The evidence shows that the taxes for teachers' and for contingent fund in Jasper district for 1867, were voted and fixed by the electors and not by the board of directors. There was no law authorizing these levies. The board of directors alone are empowered to vote or fix the rates to be levied for teachers' fund and contingent fund. This was not done and these levies, being without authority, must be held void.

The schoolhouse tax levied by the Board of Supervisors corresponds in rate in all the townships with the rates voted, but in Newton and Union townships the certificates show that this tax was voted by the board of directors and not by the electors of the district. This is claimed as being an illegality. It is not necessarily so. While the power to determine the rate of schoolhouse tax is vested primarily in the electors of the district, it is not exclusively so vested. By section 16, chapter 172, Laws of 1862, the power to determine what amount is required for the erection of a shoolhouse in a sub-district is given to the electors in such sub-district. Their action is to be certified to the next regular meeting of the electors of the district, and by the next section it is provided that, "should the electors of the district township neglect or refuse to vote said amount at said meeting, or a sum adequate for the erection of said house," the board of directors shall ascertain the per centum of the sum applied for on the property of the district, and shall apportion the same, etc.; so that, if the electors of the district neglect or refuse to vote the proper schoolhouse tax, it becomes the duty of the board of directors to do so. The tax voted by the directors in the case before us would be legal and proper under the circumstances provided for in the statute. In the absence of evidence we cannot presume their action to have been illegal.

That the Board of Supervisors in some instances levied rates smaller than those voted and certified to them by the district townships, cannot affect the validity of the taxes actually levied, nor can plaintiff complain of this action.

X. We come now to the cross-petition of the defendant, in which the court is asked to appoint a Master to take an account of all the taxes due and unpaid, etc., that the plaintiff be required to pay the amount thus found due on a day to be fixed by the court, and on failure to do so that execution issue for the sale of plaintiff's lands, etc.

Without entering into a discussion of the question whether a court of equity has power in any case, except where author- ized by statute, to enforce the collection of taxes against the property of the taxpayer, it is suffi- cient to say that the statutory remedy for the collection of the taxes in question in this case is plain, speedy and adequate; and there exists no reason to invoke the equity powers of the court to displace the legal remedy provided.

In the construction of the Act of Congress of May 15, 1856, as given in the third paragraph of this opinion, COLE, J., concurs, except as to the first quantity of land not exceed- ing one hundred and twenty sections, which the act authorized to be sold prior to the construction of any portion of the road, and except also as to the necessity of constructing the road from east to west—begining on the eastern boundary of the state. He concurs in holding the lands acquired under that act subject to taxation for the year 1867 only, basing his con- currence mainly upon the fact that the railroad company commenced the building of their road at its most easterly point, and have continued and constructed the same from east to west, and became entitled to the land *pari passu* with the construction of the road.

BECK, CH. J., and DAY, J., entirely disagree with the con- struction given to the act of Congress, and with the conclu- sion reached; they holding such lands liable to taxation for the years 1866 and 1867. In the other portions of the opin- ion we all concur.

The result is, that as to the lands acquired under the Act of Congress of June 2, 1864, the judgment of the District Court is reversed, and as to the lands acquired under the grant of May 15, 1856, the judgment will, subject to the modifications of this opinion, in this equal division of the members of the court, by operation of law, stand

AFFIRMED.

DAY, J.—I cannot fully concur in the conclusions of the foregoing opinion. Much as I regret the necessity of a division upon a question of such magnitude and importance, yet I cannot, for the mere sake of unity, yield a well defined and positive conviction.

I have time and opportunity to present my views only with very great brevity.

I. I do not concur in the construction placed upon the Act of Congress, 1856, granting these lands to the state, in aid of the railroads named.

The opinion holds the proper construction of this act to be, that the building of the various roads referred to shall begin on the Mississippi river and progress regularly thence westward to the Missouri river. However prudent or judicious it might have been, to have *required by law* that the roads should be so built, I find nothing in the Act of Congress which authorizes me to adopt this as its proper construction.

In my judgment, a law which requires the building of a road from A. by B. to C., simply means that the road, when completed, shall have A. and C. for its termini, and that B. shall be situated upon its line. Such language, it seems to me, furnishes no sufficient reason for holding that the work shall begin at A. and progress regularly past B. to C. There is, to my mind, just as much warrant for saying that the building of the roads in question must begin at the Missouri river, and by regular successive steps of twenty miles in length, progress eastward to the Mississippi, as that it must commence at the latter point, and move westward to the former.

I discover no sufficient reason in the act for adopting either construction. The grant is in aid of the building of certain

roads across the State of Iowa. It fixes the termini, but does not define where the constuction shall begin.

It is not competent for courts, by mere construction, to incorporate into this act conditions and regulations which Congress did not see fit to adopt.

If these companies had commenced the construction of their roads from the west, instead of, as they have done, from the east, I would be very unwilling to hold that by such conduct they had violated any provision of the act in question.

Further, the opinion holds that the road in question, under the Act of Congress and of the Iowa Legislature, upon the completion of any continuous twenty miles, can take only the land upon each side of such completed portion of road. I am unable to find, in the acts in question, sufficient warrant for this construction.

The plaintiff commenced the construction of its road at Cedar Rapids. If there were no lands included in the grant, within forty miles of Cedar Rapids, at the time when this company commenced building from that point, it would, under this construction, be obliged to build sixty miles of road without any aid. Thus the company would be deprived of aid when most needed. The Act of Congress provides for the sale of a quantity of land not exceeding one hundred and twenty sections, " and included within a continuous length of twenty miles of each of said roads," before any portion of such roads is built. The word " road " then, as thus used, cannot mean the completed *road*, but merely the surveyed line of the road. It further provides that when any twenty continuous miles of any of said roads is completed, then another quantity of land not exceeding one hundred and twenty sections, " and included within a continuous length of twenty miles of each of such roads, may be sold." Now, if *road*, used in connection with the first specified portion of one hundred and twenty sections, means, and can mean only, the line of road as surveyed, there seems to me no sufficient reason for holding that it means *completed road* when taken in connection with the second and subsequent portions of one hundred and twenty sections. Indeed this construction might

be rendered practically impossible. For if the first one hundred and twenty sections should be taken from the eastern terminus of the road, and twenty miles of road then built through these lands, it would be impossible to take, as compensation for building this portion of the road, lands lying alongside of it, or included within its completed portion, and the same result might happen with each successive portion of twenty miles of road across the state.

It cannot be, then, that the word *roads*, occurring in the 4th section of the Act of Congress, means anything more than the located line of road. From this it follows that, under the Act of Congress the lands are not required to be taken on each side of a completed portion of the road, but that they *may*, and under some circumstances even *must*, be taken in advance of it. And if taken in advance at all, the act does not define the proper distance in advance. True, the act of the legislature provided that the company in question should have no lands until it completed twenty miles in length of its road. But this act is no more definite than is the Act of Congress as to the place where these lands shall be taken. It contains nothing from which I can infer that if no lands could be found lying alongside of the first completed portion of twenty miles, the company could get no lands in consideration of constructing it. The true construction, it seems to me, is that when the company built twenty miles of road, it was entitled to one hundred and twenty sections of land, if that quantity could be found within a continuous distance of twenty miles along the proposed line of the road. If no lands were situated within fifty miles of the completed portion of the road, the company had a right to go fifty miles in advance of the completed terminus, and there commence making its selections. Any other construction would require the building of some of the roads intended to be aided one-third the distance across the State, before any aid could be procured.

II. Entertaining these views of the construction of the acts under which these lands were granted, I find myself unable to concur in so much of the foregoing opinion as enjoins the collection of the tax of 1866, levied upon the lands included in

the grant of 1856. The opinion reaches this result upon the ground that the railroad in question was not built through Carroll county on the 1st day of January, 1866, and that, consequently, the company was not then entitled to these lands.

Upon my construction of the statute the company may have been entitled to the lands in controversy, although not completed through Carroll county.

Upon the 28th day of December, 1865, the company filed with the governor an affidavit that on the 3d day of June preceding it had completed six sections of its road, of twenty miles each in length. Each section entitled the company to 76,800 acres of land. These six sections entitled it to 460,800 acres. It is admitted in the agreed statement of the case that of the land covered by the grant, 207,000 acres lie *east* of Carroll county, and 90,680 acres in Carroll county. It is admitted in the agreement that the company commenced selecting its lands at the most eastern point where lands included in the grant could be obtained. Thus, on the first day of January 1866, the company was *entitled* to all the lands east of Carroll county, all in it, and 116,320 acres west of it.

True the company may not *in fact*, upon that day, have acquired the right to that number of acres. If part of the lands contemplated in the grant had been sold, so that for the construction of any twenty miles of road the company did not obtain 120 sections of land, it would not, by the completion of the 120 miles before named, have acquired so large a quantity of land, lying east of and included within Carroll county. But the point I make is this: The company is plaintiff, asking the active interposition of the court to grant affirmative relief. The tax is levied upon these lands, and in the absence of proof to the contrary is presumed to have been properly and legally levied. Upon the plaintiff devolves the burden both of alleging and proving all the facts necessary to the granting of the relief prayed. Under certain circumstances the company would be entitled to all those lands in Carroll county, on the 15th day of January, 1866. It asks relief upon the ground that upon that day it was not entitled to these lands. The

burden of proof is upon it to establish this fact. The proof which it introduced, and upon which the foregoing opinion holds that it has made out its case is that, on the 3d day of June, 1865, its road had only progressed to a point within 47 miles of Carroll county, and within 49 miles of the most easterly of these lands. Upon my view of the statute this may be so, and yet the company may have been entitled to the lands. Hence plaintiff has not proved facts entitling it to relief from the taxes of 1866. It may be observed that, even if the correctness of the construction placed upon the statute should be admitted, there is no affirmative proof that the company had not constructed its road through these lands, so as to become entitled to them on the 1st day of January, 1866. The theory of the opinion seems to be that the burden of proof is upon defendant to show that the lands were taxable for that year, rather than upon the plaintiff to show that they were not. For the reasons thus hastily expressed, I most respectfully dissent from so much of the foregoing opinion as restrains the collection of the tax of 1866. In all the other conclusions of the opinion I concur.

I am authorized to state that the Chief Justice fully concurs in the views above expressed.

ON REHEARING.

MILLER, J.—Within the time prescribed by the rules of court, after the foregoing opinions were filed, plaintiff's counsel filed a petition for a rehearing, to which a reply was ordered, and was filed at the June term, 1872.

I. The first point made in the petition for rehearing attacks the doctrine of the opinion first enunciated in *The Iowa Homestead Company v. Webster County*, 21 Iowa, 221, under which the plaintiff's lands are held to be taxable when and as the same are earned by the completion of portions of its road from time to time, and prior to the issuing of certificates of the Governor and Secretary of the Interior, as provided in the Act of Congress of May 15, 1856.

In that case the plaintiff claimed, and the defendant did not deny, the right of the railroad company to select and obtain

certificates for land more than twenty miles west of its completed line. The land, claimed by the company, and on which taxes had been levied, were situated one hundred and fifty miles west of the then completed line of the railroad. The right to thus select lands from those granted at so great a distance from the end of the completed road was not, therefore, made a question or decided by the court. It was, however, made a question as to when the lands became taxable; whether from the time they were earned by the company or not until it had received from the General Government the proper evidence of title thereto, and the court says: "Upon the completion of the twenty miles of road the company had a right to take the lands in Webster county." (The right of the company to go farther than 20 miles beyond the completed line of its road for lands earned being conceded.) "This was its right under the Act of Congress, and our state legislation. And this right was afterwards recognized, for it did acquire in 1863 (if not before), by the action of the Department at Washington, the full legal title. Having, then, completed so much of the road on the 1st day of January, 1861, could the counties legally tax the one hundred and twenty sections of land *to which the company became entitled by virtue of such completion?*" The question is thus fairly made and fairly stated, and, after the statement of an argument in favor of a negative answer to the question, the court further says, that "it is undeniably true that, upon the completion of so much of the line (within the time, and in the manner fixed by the Act, as to which there is no question), the company was legally and absolutely entitled to this quantity of land. And if the several Acts had designated the particular tracts to which, from time to time, the company would become entitled, there could remain no doubt that the completion of any twenty miles would vest such an interest to the lands thus set apart therefor, as would make them liable to taxation. And this, too, though the certificate of the Governor, and the final certificate at the Department at Washington should not be made for months afterward. In other words, these subsequent acts would be but the perfection of the *evidence* of title,

while the *fact* of completion would form the true basis of the right, and at once vest the interest." The learned Judge delivering the opinion, after further argument in support of the view taken, concludes as follows: "And our opinion is, under the Act making the grant to the State, and the subsequent Act of the Legislature, that at least when the company completed this twenty miles of road, all of the one hundred and twenty sections to which it became entitled, by virtue thereof, were liable to taxation. In other words, that while it might be necessary thereafter for the company to procure further evidence of title, it, *by the fact of completing its line to this extent*, acquired a right or interest in these lands, which was subject to taxation."

It is not correct, therefore, as claimed by the learned counsel for plaintiff, that what was said by the court on this point is simply dictum. The language is used in the decision of a question presented in the record, and which it is necessary to decide.

The decision was approved and followed in the subsequent case of *The Dubuque and Pacific Railroad Company v. Webster County*, 21 Iowa, 235. We are asked, however, to overrule these cases, or to disregard them for the alleged reason that they are overruled by *The Cedar Rapids & Mo. R. R. Co. v. Woodbury Co.*, 29 Iowa, 247. A perusal of this last named case will satisfy any one that the court in making the decision did not intend to, and did not understand that it was overruling those cases. On the contrary, the last case is expressly distinguished from this in 21 Iowa. The court says, in regard to those cases, "with the construction there given and the views there expressed, we are still content, and did the facts of this case bring it within those, we should have no hesitation in holding these lands taxable, or that plaintiff had a taxable interest therein." So far, therefore, from those cases being overruled by the Woodbury county case, they are there expressly approved in clear and explicit language. From the doctrine of those cases we see no good reason now to depart, although it be considered not entirely free from doubt.

There is no question of evidence arising in this branch of the case. The facts upon which the doctrine of *The Homestead Company v. Webster County, supra,* is held to apply, are settled by agreement of the parties. This agreement shows the date of the completion of the various portions of the road and of the whole road, and upon these admitted facts, that doctrine is applied and the lands held taxable from the time the plaintiff became entitled thereto, from time to time, by the completion of the different portions of its road.

There is, in our judgment, no conflict between these cases and *The Des Moines Navigation and R. R. Co. v. Polk Co.,* 10 Iowa, 1; *The State ex rel. v. Kirkwood,* 14 Iowa, 162; *The Iowa R'd Land Co. v. Story County,* 36 Iowa, 48; *The Iowa Falls & Sioux City R'y Co. v. Cherokee County,* or *Goodrich v. Beaman,* 37 Iowa, 563.

II.   In respect to the road taxes, we do not deem it necessary to add anything to what is said in the first opinion. We think the evidence shows a substantial compliance with the law in the assessment and levy, in fact, of the road taxes, although there were irregularities in certifying the delinquent taxes by the township clerk in, and placing the same upon, the tax lists. There is no claim that these taxes have been paid, for these were irregularities of form; a court of equity ought not and will not relieve against the payment of taxes justly due and unpaid.

The petition for a rehearing will be

OVERRULED.

BECK, J.—At the present term of this court appellants made application in due form for the modification of the judgment here rendered so far as to relieve them of the penalties incurred under the statute upon the delinquent taxes involved in the action. As appears in the foregoing opinion, the judgment of this court was rendered December, 1872. February 7, 1873, a petition for rehearing was filed by plaintiffs and the *procedendo* stayed thereon. A rehearing was granted in April following, and the appellees replied to the petition for rehearing in June. For some reason, which need not be determined, the cause was not at once submitted to us; it did

not reach us so that a decision upon the re-argument could be announced until the present term. The case has been delayed beyond the time usual for the disposition of business in this court. The action was commenced in the District Court in December 1870. It will be seen that considerable time has elapsed since the commencement of the suit, and that the penalties prescribed by the statute upon the delinquent taxes in controversy have amounted to a very considerable sum. To obtain relief from these penalties is the object of the application before us.

I.—It is first claimed that this court ought to determine when the penalties began to run, as the lands were not assessed for the years for which they are taxed. This matter was considered and determined by us, as will appear in the original opinion. We hold as the taxes were not entered upon the tax book until November 1, 1868, the penalties ought not to begin until that day. Of this ruling plaintiffs cannot complain in view of the provisions of the statute which make it the duty of land owners to have their lands assessed by the treasurer when it has been omitted by the assessor, Rev. § 753, and affixes a penalty for the non-payment of taxes without regard to the circumstances of their assessment, whether made by the assessor at the time prescribed by law or by the treasurer at a subsequent date.

II. Under the law now in force, Code, § 866, penalties for delinquent taxes are not the same as provided by the statute prevailing when the taxes involved in this action were assessed, which continued in force until after the decision of the court announced in the foregoing opinion. It is now insisted: 1. That, under Code, § 51, (which provides that "no penalty * * * incurred under any statute hereby repealed and before the repeal takes effect, shall be affected by the repeal, except that when * * a penalty * * is mitigated by the provisions herein contained, such provisions shall be applied to a judgment to be pronounced after the repeal,") the penalty upon the taxes must conform to the law of the Code. 2. That, as under § 47 of the Code the statutes before existing which are named therein, or are repug-

14. ——: penalties: repeal of statute.

nant thereto, are repealed, the statutes under which the pen-alties accrued are no longer of force, and there is, therefore, no law to support the penalties, and they cannot be enforced. But the ready and most satisfactory answer to these questions is found in the following considerations: Under the statutes in force prior to the Code the penalties had accrued, month by month, during the delinquency. The right of defendant to these penalties had thus become perfect under the statute. Code, § 50, is in these words: "This repeal of existing statutes shall not affect any act done, any right accruing or which has accrued or been established, nor any suit or proceeding had or commenced in any civil cause before the time when such repeal takes effect; but the proceedings in such cases shall be conformed to the provisions of this Code as far as consistent." It is quite obvious that the right of defendant to the penalties secured by the law before the repealing Act took effect is not impaired thereby. The points demand no further consideration.

III. It is next urged that, as it was the duty of the treasurer to sell the lands for taxes in October, 1869, he cannot, **15. ——: failure to sell.** by failing to perform that duty, enable the county to retain the taxes upon its books unsatisfied, drawing the heavy penalty provided by law; that these penalties cease to run after the date at which the lands could have been sold for taxes. The only answer that need be given to this proposition is that the law does not so provide. We find nothing in the statute that will bear a construction supporting appellant's position.

IV. It is urged that the penalties are onerous, inequitable and oppressive; that they have accrued, while plaintiffs' **16. ——: accumulation of penalties: equity.** were, in good faith, contesting the rights of defendant to enforce them and that the questions of law involved were doubtful, and justified plaintiffs in resisting the payment of the taxes. That plaintiffs' will suffer a hardship in the payment of these heavy penalties is very apparent; that the questions involved in the cause were doubtful, and the litigation has been prosecuted in good faith, may be conceded, but these things give us no authority

The C. R. & M. R. R. Co. and The I. R. L. Co. v. Carroll Co.

to annul a statute and remit a penalty explicitly provided for, and in which defendant has a vested right.

The delay incident to the progress of this cause, especially in this court, has been great, and plaintiff has been subject thereby to suffer from the enormous increase of the penalties. This is no ground for relief; it is an incident of litigation, the risk of which parties are required to assume. None of these considerations will authorize us, without law or precedent, to abate any part of the sum to which defendant is entitled under the law. With the hardships of the law, or with those resulting fortuitous circumstances connected with its administration, we have nothing to do. When the rule is admitted that equity will not relieve against penalties imposed by statute, arguments based upon hardships furnish us no avenue of escape from its operation. The relief asked upon the application under consideration is refused.

---

*The early publication of this opinion being deemed of importance, by direction of the court it is here published, although the case was not finally disposed of until April 7, 1876. The original opinion was filed December 11, 1872. An opinion overruling the petition for rehearing was filed June 3, 1874, and this was followed, on June 21, 1874, by an opinion refusing the application for remission of penalties. The final order in the case was made April 7, 1876.